## GRIGGS *v.* ALLEGHENY COUNTY.

No. 81. Argued January 16, 1962.—Decided March 5, 1962.

*William A. Blair* argued the cause for petitioner. With him on the briefs was *D. Malcolm Anderson.*

*Maurice Louik* argued the cause for respondent. With him on the briefs were *Francis A. Barry* and *Philip Baskin.*

Briefs of *amici curiae* were filed by *Lyman M. Tondel, Jr., H. Templeton Brown* and *Robert L. Stern* for Allegheny Airlines, Inc., et al.; *Leander I. Shelley* for Airport Operators Council; and *Thomas L. Morrow, Edward G. Dobrin, Stanley B. Long* and *Robert W. Graham* for the Port of Seattle.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case is here on a petition for a writ of certiorari to the Supreme Court of Pennsylvania which we granted (366 U. S. 943) because its decision (402 Pa. 411, 168 A. 2d 123) seemed to be in conflict with *United States* v. *Causby,* 328 U. S. 256. The question is whether respond-

ent has taken an air easement over petitioner's property for which it must pay just compensation as required by the Fourteenth Amendment. *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 241. The Court of Common Pleas, pursuant to customary Pennsylvania procedure, appointed a Board of Viewers to determine whether there had been a "taking" and, if so, the amount of compensation due. The Board of Viewers met upon the property; it held a hearing, and in its report found that there had been a "taking" by respondent of an air easement over petitioner's property and that the compensation payable (damages suffered) was $12,690. The Court of Common Pleas dismissed the exceptions of each party to the Board's report. On appeal, the Supreme Court of Pennsylvania decided, by a divided vote, that if there were a "taking" in the constitutional sense, the respondent was not liable.

Respondent owns and maintains the Greater Pittsburgh Airport on land which it purchased to provide airport and air-transport facilities. The airport was designed for public use in conformity with the rules and regulations of the Civil Aeronautics Administration within the scope of the National Airport Plan provided for in 49 U. S. C. § 1101 *et seq.* By this Act the federal Administrator is authorized and directed to prepare and continually revise a "national plan for the development of public airports." § 1102 (a). For this purpose he is authorized to make grants to "sponsors" for airport development. §§ 1103, 1104. Provision is made for apportionment of grants for this purpose among the States. § 1105. The applications for projects must follow the standards prescribed by the Administrator. § 1108.

It is provided in § 1108 (d) that: "No project shall be approved by the Administrator with respect to any airport unless a public agency holds good title, satisfactory to the Administrator, to the landing area of such airport or the site therefor, or gives assurance satisfactory

to the Administrator that such title will be acquired." The United States agrees to share from 50% to 75% of the "allowable project costs," depending, so far as material here, on the class and location of the airport. § 1109.

Allowable costs payable by the Federal Government include "costs of acquiring land or interests therein or easements through or other interests in air space . . . ." § 1112 (a)(2).

Respondent executed three agreements with the Administrator of Civil Aeronautics in which it agreed, among other things, to abide by and adhere to the Rules and Regulations of C. A. A. and to "maintain a master plan of the airport," including "approach areas." It was provided that the "airport approach standards to be followed in this connection shall be those established by the Administrator"; and it was also agreed that respondent "will acquire such easements or other interests in lands and air space as may be necessary to perform the covenants of this paragraph." The "master plan" laid out and submitted by respondent included the required "approach areas"; and that "master plan" was approved. One "approach area" was to the northeast runway. As designed and approved, it passed over petitioner's home which is 3,250 feet from the end of that runway. The elevation at the end of that runway is 1,150.50 feet above sea level; the door sill at petitioner's residence, 1,183.64 feet; the top of petitioner's chimney, 1,219.64 feet. The slope gradient of the approach area is as 40 is to 3,250 feet or 81 feet, which leaves a clearance of 11.36 feet between the bottom of the glide angle and petitioner's chimney.

The airlines that use the airport are lessees of respondent; and the leases give them, among other things, the right "to land" and "take off." No flights were in violation of the regulations of C. A. A.; nor were any flights

lower than necessary for a safe landing or take-off. The planes taking off from the northeast runway observed regular flight patterns ranging from 30 feet to 300 feet over petitioner's residence; and on let-down they were within 53 feet to 153 feet.

On take-off the noise of the planes is comparable "to the noise of a riveting machine or steam hammer." On the let-down the planes make a noise comparable "to that of a noisy factory." The Board of Viewers found that "The low altitude flights over plaintiff's property caused the plaintiff and occupants of his property to become nervous and distraught, eventually causing their removal therefrom as undesirable and unbearable for their residential use." Judge Bell, dissenting below, accurately summarized the uncontroverted facts as follows:

"Regular and almost continuous daily flights, often several minutes apart, have been made by a number of airlines directly over and very, very close to plaintiff's residence. During these flights it was often impossible for people in the house to converse or to talk on the telephone. The plaintiff and the members of his household (depending on the flight which in turn sometimes depended on the wind) were frequently unable to sleep even with ear plugs and sleeping pills; they would frequently be awakened by the flight and the noise of the planes; the windows of their home would frequently rattle and at times plaster fell down from the walls and ceilings; their health was affected and impaired, and they sometimes were compelled to sleep elsewhere. Moreover, their house was so close to the runways or path of glide that as the spokesman for the members of the Airlines Pilot Association admitted 'If we had engine failure we would have no course but to plow into your house.'" 402 Pa. 411, 422, 168 A. 2d 123, 128–129.

We start with *United States* v. *Causby, supra,* which held that the United States by low flights of its military planes over a chicken farm made the property unusable for that purpose and that therefore there had been a "taking," in the constitutional sense, of an air easement for which compensation must be made. At the time of the *Causby* case, Congress had placed the navigable airspace in the public domain, defining it as "airspace above the minimum safe altitudes of flight prescribed" by the C. A. A. 44 Stat. 574. We held that the path of the glide or flight for landing or taking off was not the downward reach of the "navigable airspace." 328 U. S., at 264. Following the decision in the *Causby* case, Congress redefined "navigable airspace" to mean "airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include airspace needed to insure safety in take-off and landing of aircraft." 72 Stat. 739, 49 U. S. C. § 1301 (24). By the present regulations [1] the "minimum safe altitudes" within the meaning of the statute are defined, so far as relevant here, as heights of 500 feet or 1,000 feet, "[e]xcept where necessary for take-off or landing." But as we said in the *Causby*

---

[1] Regulation 60.17, entitled "Minimum safe altitudes," provides:

"*Except when necessary for take-off or landing,* no person shall operate an aircraft below the following altitudes:

"(a) *Anywhere.* An altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface;

"(b) *Over congested areas.* Over the congested areas of cities, towns or settlements, or over an open-air assembly of persons, an altitude of *1,000 feet* above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft. . . .

"(c) *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In such event, the aircraft shall not be operated closer than 500 feet to any person, vessel, vehicle, or structure. . . ." (Emphasis supplied except in catch lines.) 14 CFR § 60.17.

case, the use of land presupposes the use of some of the airspace above it.  328 U. S., at 264.  Otherwise no home could be built, no tree planted, no fence constructed, no chimney erected.  An invasion of the "superadjacent airspace" will often "affect the use of the surface of the land itself."  328 U. S., at 265.

It is argued that though there was a "taking," someone other than respondent was the taker—the airlines or the C. A. A. acting as an authorized representative of the United States.  We think, however, that respondent, which was the promoter, owner, and lessor [2] of the airport, was in these circumstances the one who took the air easement in the constitutional sense.  Respondent decided, subject to the approval of the C. A. A., where the airport would be built, what runways it would need, their direction and length, and what land and navigation easements would be needed.  The Federal Government takes nothing; it is the local authority which decides to build an airport *vel non*, and where it is to be located.  We see no difference between its responsibility for the air easements necessary for operation of the airport and its responsibility for the land on which the runways were built.  Nor did the Congress when it designed the legislation for a National Airport Plan.  For, as we have already noted, Congress provided in 49 U. S. C. § 1109 for the payment to the owners of airports, whose plans were approved by the Administrator, of a share of "the allowable project costs," including the "costs of acquiring land or interests therein or easements through or other interests in air space."  § 1112 (a) (2).  A county that designed and constructed a bridge would not have a usable facility unless it had at least an easement over the land necessary for the

---

[2] In circumstances more opaque than this we have held lessors to their constitutional obligations.  See *Burton* v. *Wilmington Parking Auth.*, 365 U. S. 715.

approaches to the bridge. Why should one who designs, constructs, and uses an airport be in a more favorable position so far as the Fourteenth Amendment is concerned? That the instant "taking" was "for public use" is not debatable. For respondent agreed with the C. A. A. that it would operate the airport "for the use and benefit of the public," that it would operate it "on fair and reasonable terms and without unjust discrimination," and that it would not allow any carrier to acquire "any exclusive right" to its use.

The glide path for the northeast runway is as necessary for the operation of the airport as is a surface right of way for operation of a bridge, or as is the land for the operation of a dam. See *United States* v. *Virginia Electric Co.,* 365 U. S. 624, 630. As stated by the Supreme Court of Washington in *Ackerman* v. *Port of Seattle,* 55 Wash. 2d 401, 413, 348 P. 2d 664, 671, ". . . an adequate approach way is as necessary a part of an airport as is the ground on which the airstrip, itself, is constructed . . . ." Without the "approach areas," an airport is indeed not operable. Respondent in designing it had to acquire some private property. Our conclusion is that by constitutional standards it did not acquire enough.

*Reversed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE FRANK-FURTER concurs, dissenting.

In *United States* v. *Causby,*[1] the Court held that by flying its military aircraft frequently on low landing and takeoff flights over Causby's chicken farm the United States had so disturbed the peace of the occupants and so frightened the chickens that it had "taken" a flight easement from Causby for which it was required to pay "just compensation" under the Fifth Amendment. Today the

---

[1] 328 U. S. 256.

Court holds that similar low landing and takeoff flights, making petitioner Griggs' property "undesirable and unbearable for . . . residential use," constitute a "taking" of airspace over Griggs' property—not, however, by the owner and operator of the planes as in *Causby,* but by Allegheny County, the owner and operator of the Greater Pittsburgh Airport to and from which the planes fly. Although I dissented in *Causby* because I did not believe that the individual aircraft flights "took" property in the constitutional sense merely by going over it and because I believed that the complexities of adjusting atmospheric property rights to the air age could best be handled by Congress, I agree with the Court that the noise, vibrations and fear caused by constant and extremely low overflights in this case have so interfered with the use and enjoyment of petitioner's property as to amount to a "taking" of it under the *Causby* holding. I cannot agree, however, that it was the County of Allegheny that did the "taking." I think that the United States, not the Greater Pittsburgh Airport, has "taken" the airspace over Griggs' property necessary for flight.[2] While the County did design the plan for the airport, including the arrangement of its takeoff and approach areas, in order to comply with federal requirements it did so under the supervision of and subject to the approval of the Civil Aeronautics Administrator of the United States.[3]

Congress has over the years adopted a comprehensive plan for national and international air commerce, regulating in minute detail virtually every aspect of air transit—from construction and planning of ground facilities to

---

[2] We are not called on to pass on any question of "taking" under the Pennsylvania Constitution or laws.

[3] 60 Stat. 174–176, as amended, 49 U. S. C. §§ 1108, 1110. The duties of the Civil Aeronautics Administrator have since been transferred to the Federal Aviation Agency Administrator. 72 Stat. 806–807.

safety and methods of flight operations.[4]   As part of this overall scheme of development, Congress in 1938 declared that the United States has "complete and exclusive national sovereignty in the air space above the United States"[5] and that every citizen has "a public right of freedom of transit in air commerce through the navigable air space of the United States."[6]   Although in *Causby* the Court held that under the then existing laws and regulations the airspace used in landing and takeoff was not part of the "navigable airspace" as to which all have a right of free transit, Congress has since, in 1958, enacted a new law, as part of a regulatory scheme even more comprehensive than those before it, making it clear that the "airspace needed to insure safety in take-off and landing of aircraft" is "navigable airspace."[7]   Thus Congress has not only appropriated the airspace necessary for planes to fly at high altitudes throughout the country but has also provided the low altitude airspace essential for those same planes to approach and take off from airports.   These airspaces are so much under the control of the Federal Government that every takeoff from and every landing at

---

[4] The Federal Aviation Agency Administrator is directed to prepare and maintain a "national plan for the development of public airports in the United States" taking "into account the needs of both air commerce and private flying, the probable technological developments in the science of aeronautics, [and] the probable growth and requirements of civil aeronautics."   49 U. S. C. § 1102.   The detailed features of the federal regulatory and development scheme are found in 49 U. S. C. cc. 14 (Federal-Aid for Public Airport Development), 15 (International Aviation Facilities) and 20 (Federal Aviation Program).

[5] 52 Stat. 1028, 49 U. S. C. § 1508.

[6] 52 Stat. 980, 49 U. S. C. § 1304.

[7] Section 101 (24) of the Federal Aviation Act of 1958 provides: " 'Navigable airspace' means airspace above the minimum altitudes of flight prescribed by regulations issued under this Act, and shall include airspace needed to insure safety in take-off and landing of aircraft."   72 Stat. 739, 49 U. S. C. § 1301 (24).

airports such as the Greater Pittsburgh Airport is made under the direct signal and supervisory control of some federal agent.[8]

In reaching its conclusion, however, the Court emphasizes the fact that highway bridges require approaches. Of course they do. But if the United States Highway Department purchases the approaches to a bridge, the bridge owner need not. The same is true where Congress has, as here, appropriated the airspace necessary to approach the Pittsburgh airport as well as all the other airports in the country. Despite this, however, the Court somehow finds a congressional intent to shift the burden of acquiring flight airspace to the local communities in 49 U. S. C. § 1112, which authorizes reimbursement to local communities for "necessary" acquisitions of "easements through or other interests in air space." But this is no different from the bridge-approach argument. Merely because local communities might eventually be reimbursed for the acquisition of necessary easements does not mean that local communities must acquire easements that the United States has already acquired. And where Congress has already declared airspace *free* to all—a fact not denied by the Court—pretty clearly it need not again be acquired by an airport. The "necessary" easements for which Congress authorized reimbursement in § 1112 were those "easements through or other interests in air space" necessary for the clearing and protecting of "aerial approaches" from physical "airport hazards"[9]—a duty explicitly placed on the local communities by the statute (§ 1110) and by their contract with the Government.

---

[8] 14 CFR § 60.18. The Administrator of the Federal Aviation Agency is directed to control "the use of the navigable airspace of the United States." 49 U. S. C. § 1303 (c).

[9] The term "airport hazard" means "any structure or object of natural growth . . . or any use of land . . . which obstructs the air space . . . or is otherwise hazardous to . . . landing or taking off of aircraft." 49 U. S. C. § 1101 (a)(4).

There is no such duty on the local community to acquire flight airspace. Having taken the airspace over Griggs' private property for a public use, it is the United States which owes just compensation.

The construction of the Greater Pittsburgh Airport was financed in large part by funds supplied by the United States as part of its plan to induce localities like Allegheny County to assist in setting up a national and international air-transportation system. The Court's imposition of liability on Allegheny County, however, goes a long way toward defeating that plan because of the greatly increased financial burdens (how great one can only guess) which will hereafter fall on all the cities and counties which till now have given or may hereafter give support to the national program. I do not believe that Congress ever intended any such frustration of its own purpose.

Nor do I believe that Congress intended the wholly inequitable and unjust saddling of the entire financial burden of this part of the national program on the people of local communities like Allegheny County. The planes that take off and land at the Greater Pittsburgh Airport wind their rapid way through space not for the peculiar benefit of the citizens of Allegheny County but as part of a great, reliable transportation system of immense advantage to the whole Nation in time of peace and war. Just as it would be unfair to require petitioner and others who suffer serious and peculiar injuries by reason of these transportation flights to bear an unfair proportion of the burdens of air commerce, so it would be unfair to make Allegheny County bear expenses wholly out of proportion to the advantages it can receive from the national transportation system. I can see no justification at all for throwing this monkey wrench into Congress' finely tuned national transit mechanism. I would affirm the state court's judgment holding that the County of Allegheny has not "taken" petitioner's property.