STANDEN *v.* ALPENA COUNTY

Aviation—Operations—Surrounding Landowners—Easements.

>   Defendant county, as owner of a county airport and receiver of
>   benefits from its operation, owes a duty to the surrounding
>   landowners not to allow disruption of the use and enjoyment
>   of their property by the operation of aircraft over their lands
>   at low altitudes in taking off and landing; and that duty
>   cannot be evaded by contrived reservations and agreements in
>   leases or deeds between the county and the Federal govern-
>   ment, nor can the county contract away the county's responsi-
>   bility to compensate landowners for the taking of aviation
>   easements over their lands.

Appeal from Alpena, Edward H. Fenlon, J., pre-
siding. Submitted Division 3 November 5, 1969, at
Grand Rapids. (Docket No. 5,101.) Decided March
23, 1970. Rehearing denied April 22, 1970.

Complaint by Floyd Standen and Ethel Standen
and 16 other property owners against the County
of Alpena to recover money damages for the taking
of aviation easements by the county. Judgment for
defendant. Plaintiffs appeal. Reversed and re-
manded.

---

References for Points in Headnote

8 Am Jur 2d, Aviation § 7.
Airport operations or flight of aircraft as taking or damaging of
property. 77 ALR2d 1355.

*Levine & Benjamin* (*Alan H. Tushman,* of counsel), for plaintiffs.

*Roger C. Bauer,* Prosecuting Attorney, and *Bodman, Longley, Bogle, Armstrong & Dahling* (*James M. Baysinger,* of counsel), for defendant.

Before: FITZGERALD, P. J., and R. B. BURNS and BRONSON, JJ.

BRONSON, J. Plaintiffs instituted this action in the circuit court for the county of Alpena to recover money damages for the alleged taking of aviation easements by the county. Plaintiffs are 18 property owners owning homes immediately adjacent to the southern approach to the north-south runway of the defendant county-owned Phelps Collins Airport. Plaintiffs claim an inverse condemnation of their property. There is uncontroverted testimony to the effect that planes taking off from the north-south runway cause plaster to fall from plaintiffs' ceilings, cause unbearable noise, cause window panes to rattle, and are generally disruptive of plaintiffs' use and enjoyment of their property. The trial judge in his written opinion found that "persuasive proofs were adduced in support of plaintiffs' claims pleaded, relating to the creation of excessive noises, vibrations, smoke, and other disturbances caused by numerous aircraft flying directly over or near plaintiffs' property at extremely low and dangerous altitudes."

The trial court found that:

"After reviewing the testimony as it may have related to the county's liability in the instant suit, and after thorough consideration of the terms of the quit-claim deed received in evidence, the county is not liable."

From this decision plaintiffs appeal.

The sole issue decided by the trial court and the only question we need consider in this opinion is:

Assuming that plaintiffs have proven an unconstitutional taking of their property and are entitled to recover, is the county of Alpena liable to the plaintiffs for such damages as may be determined by the court?

The trial court found no liability on the part of the county. We cannot agree.

Plaintiffs and defendant each cite as authority for their position *Griggs* v. *County of Allegheny* (1962), 369 US 84 (82 S Ct 531; 7 L Ed 2d 585). In *Griggs,* a property owner brought suit against the county for an alleged appropriation of his property resulting from take-off and landing of aircraft at the county airport. The Supreme Court held that where noise from aircraft landing and taking off made a home located off the end of the runway unbearable for residential use, there was a "taking" of an air easement over the property, and that the county was liable to the property owner. There the Supreme Court stated at pp 89, 90:

"It is argued that though there was a 'taking,' someone other than respondent was the taker—the airlines or the CAA acting as an authorized representative of the United States. We think, however, that respondent, which was the promoter, owner, and lessor* of the airport, was in these circumstances the one who took the air easement in the constitutional sense. Respondent decided, subject to the approval of the CAA, where the airport would be built, what runways it would need, their direction and length, and what land and navigation ease-

---

* "In circumstances more opaque than this we have held lessors to their constitutional obligations. See *Burton* v. *Wilmington Parking Authority* (1961), 365 US 715, 81 S Ct 856, 6 L Ed 2d 45." (Footnote by the Supreme Court.)

ments would be needed. The Federal Government takes nothing; it is the local authority which decides to build an airport *vel non,* and where it is to be located. We see no difference between its responsibility for the air easements necessary for operation of the airport and its responsibility for the land on which the runways were built. Nor did the Congress when it designed the legislation for a National Airport Plan. For, as we have already noted, Congress provided in 49 USC § 1109, 49 USCA § 1109, for the payment to the owners of airports, whose plans were approved by the Administrator, of a share of 'the allowable project costs' including the 'costs of acquiring land or interests therein or easements through or other interests in air space.' § 1112(a)(2). A county that designed and constructed a bridge would not have a usable facility unless it had at least an easement over the land necessary for the approaches to the bridge. Why should one who designs, constructs, and uses an airport be in a more favorable position so far as the Fourteenth Amendment is concerned? That the instant 'taking' was 'for public use' is not debatable. For respondent agreed with the CAA that it would operate the airport 'for the use and benefit of the public,' that it would operate it 'on fair and reasonable terms and without unjust discrimination,' and that it would not allow any carrier to acquire 'any exclusive right' to its use."

The distinguishing factor in the *Griggs* case, not mentioned in the majority opinion, but apparently underlying the Court's conclusion, is the agreement between the United States and the county of Allegheny by which the county was paid substantial Federal aid for the construction of its airport. The Pennsylvania court in *Griggs* cited, among other provisions, the following:

" 'Insofar as is within its powers and reasonably possible, *the sponsor* [county of Allegheny] *will*

*prevent the use of any land either within or outside
the boundaries of the airport in any manner* (in-
cluding the construction, erection, alteration, or
growth of any structure or other object thereon)
*which would create a hazard to the landing, take-off
or maneuvering of aircraft at the airport, or other-
wise limit the usefulness of the airport. This ob-
jective will be accomplished* either by the adoption
and enforcement of a zoning ordinance and regula-
tions, *or by the acquisition of easements or other
interest in land or airspace,* or by both such meth-
ods.'" *Griggs* v. *County of Allegheny* (1961), 402
Pa 411 (168 A2d 123).

This agreement specifically placed the duty and
obligation upon the county of Allegheny to acquire
lands, buildings, easements, and other interests in
land which unless acquired would create a hazard
to the landing, take-off, paths of glide, descent paths,
and authorized flight of aircraft. The majority
opinion of Justice Douglas is based upon the above
agreement which places both control and possession
of the airport in the county of Allegheny.

The injury claimed and the damage alleged in the
present case arise from a type of use and possession
of airport land that is seemingly beyond the power
of control granted to the county of Alpena.

An analysis of the quit-claim deed of October 5,
1949, whereby the Federal government deeded the
airport in question to the county of Alpena, reveals
the following:

In paragraph 1 of page 5 the following language
appears:

"(1) That insofar as it is within its powers, the
party of the second part [county] shall adequately
clear and protect the aerial approaches to the air-
port by removing, lowering, relocating, marking or
lighting or otherwise mitigating existing airport

hazards and by preventing the establishment or creation of future airport hazards."

Paragraph 2 of page 5 of the deed gives the United States Government the right to non-exclusive use of the landing area of the airport.

"(2) That the United States of America through any of its employees or agents shall at all times have the right to make non-exclusive use of the landing area of the airport at which any of the property transferred by this instrument is located or used, without charge."

Further, title to the property in the county is not absolute. The transfer is subject to reversion.

"(1) That in the event that any of the aforesaid terms, conditions, reservations or restrictions is not met, observed, or complied with by the party of the second part or any subsequent transferee, whether caused by the legal inability of said party of the second part or subsequent transferee to perform any of the obligations herein set out, or otherwise, the title, right of possession and all other rights transferred by this instrument to the party of the second part, or any portion thereof, shall at the option of the party of the first part revert to the party of the first part sixty (60) days following the date upon which demand to this effect is made." (Deed, p 8.)

This control and possession on the part of the Federal government is expressed on page 9 of the deed where it is stated that the covenants in the deed are to be construed as conditions which, if breached, would allow the government to exercise its option to cause title, right of possession and all other rights to revert back to it.

Through the above artfully drafted clauses the Federal government has assured itself the use of the airport without local interference. In the 1953

lease between the Federal government and the county of Alpena the following clause appears:

"6. The Lessor shall furnish to the government, as part of the rental consideration, the following:

* * *

"c. The government shall have the right to construct a 3,000 foot extension to the south end of the north-south runway and to construct overrun strips to said north-south runway and taxiways and to clear and keep clear all obstructions in the clear zone and the approach zone to conform to Air Force Regulation 86–3."

In a supplemental agreement dated April 9, 1963, the Federal government obtained the right to extend the north-south runway 1,000 feet:

"d. The government shall have the right to extend the north-south runway from 8,000 to 9,000 feet by a 1,000-foot paved extension to the south end of said runway, including additional taxiway, holding pad, blast pad, install additional runway lights, relocation of barriers, improve overruns and do all such other necessary modifications and work in connection with such extension."

"22. That the government will be responsible for the removal and clearance of any obstructions and hazards within the glide plane surface and/or transitional surfaces of the approach zone lying south of the present southerly boundary of Phelps Collins Airport and which require clearance or removal by reason of the construction of the 1,000-foot extension of the north-south runway as provided in paragraph 2 of this supplement. The topping, lowering, removal and clearance of such hazards and obstructions shall be accomplished in accordance with the present FAA criteria in Technical Standard O–N18."

It is the duty of the county of Alpena to clear and protect aerial approaches to the airport adequately *insofar as it is within its powers.* (1949 Deed.)

However, by virtue of the supplemental agreement of April 9, 1963 (quoted above in part), it is the Federal government who "will be responsible" for adequately clearing and protecting aerial approaches to the extension of the north-south runway. This amounts to pre-emptive control of the extension since if there is any interference or conflict in the use and maintenance of approaches between the county of Alpena and the Federal government title and right of possession now resting with the county would in accordance with the 1949 deed revert back to the Federal government. Therefore control and possession, which were both vested in the county of Allegheny in the *Griggs* case, are not vested in the county of Alpena in the present case. The duty and obligation to acquire lands and easements is in the Federal government in the present case, not in the county.

We do not read *Griggs* in so narrow a manner as does defendant. Rather, we see *Griggs* as being a landmark decision which enables certain persons to seek redress from their government for alleged invasions of their property rights. *Griggs* should not be read and applied in such a twisted way as to defeat those persons whom the United States Supreme Court by their decision in *Griggs* intended to benefit.

It is apparent from an examination of the record and transcript in this case that a definite benefit inures to the county from the existence and operation of Phelps Collins Airport. During the summer months military flights bringing summer trainees account for approximately 80% of the air traffic at the airport. For the rest of the year about 80% of the air traffic is comprised of private users and an airline.[1] Testimony by Robert Welsh, the airport

---

[1] The amount of traffic by private users and the airline stays fairly constant throughout the year. It is only the amount of total traffic that fluctuates.

manager, established the various, relationships that
the county maintains with users of the airport. The
general indication evidenced in Welsh's testimony
was that the county recognizes the value of the air-
port to local commerce. Thus, it is understandable
that the county would not seek to take any affirmative
action which would force a confrontation with the
Federal government and possible loss of the air-
port.[2]

Whatever responsibility our decision imposes up-
on the county, it is one of the county's own making.
Artfully contrived reservations and agreements be-
tween the Federal government and the county can-
not contract away the county's responsibilities.

The present owner of the airport is the county of
Alpena. As such, it owes a duty to the surrounding
landowners. That duty cannot be evaded by the
county with the argument, "We might risk loss of the
airport."

Plaintiffs are residents of Alpena County. They
alone of the population of Alpena County are being
forced to bear what may well prove to be the unrea-
sonable hardship that the present operation of the
north-south runway as it now exists entails.

The county voluntarily entered into the deed
agreement of 1949. As a matter of fact, the county
of Alpena receives benefit from ownership of the
airport. We cannot accept the argument that by
holding defendant county liable in the present action
this Court is forcing defendant to lose ownership
of the airport. What we do here is to determine the
rights of 18 plaintiff residents of Alpena County.

The county of Alpena cannot hide under the um-
brella of immunity by holding a deed over its head.

---

[2] At oral argument appellee earnestly advocated "that were an
injunction issued against the county to stop flights using the north-
south·runway extension, how long would the county be able to keep
the airport before the government took it back under reverter?"

It should not be permitted to escape its responsibilities by pointing a finger at Washington. The finger of responsibility is clearly pointed at the county of Alpena. Accordingly, we find that, if any damages be proven, the county of Alpena should be held liable for damages awarded.

Reversed and remanded for further hearings consistent with this opinion.

All concurred.