**Capristo v. Commonwealth**

*E. Charles Coslett,* for plaintiff.

*Peter J. Comerota,* for Commonwealth.

TREMBATH, R. J. (Forty-Fourth Judicial District, Specially Presiding), July 7, 1972.—Plaintiff brought this eminent domain proceeding to recover damages to his property caused by water discharged on his property as a result of the construction of Route 81 in Plains Township, Luzerne County.

U. S. Route 81 and Pennsylvania Route 315 in the vicinity of plaintiff's land are approximately parallel and run generally east and west, Route 81 being south of Route 315. Both of these roads are intersected roughly at right angles by Jumper Road, which crosses Route 315 at grade and underpasses Route 81.

The construction of Route 81 in this area on a high fill changed the existing surface drainage so that surface waters from the area, including a drainage area of about 150 acres south of Route 81, are led through drainage ditches and culverts along each side of Jumper Road to Route 315 and are then discharged under Route 315 through a 48-inch pipe onto lands abutting Route 315 on the north. All of the drainage ditches and culverts along or under Jumper Road, together with the 48-inch pipe under Route 315 and the specification for all such ditches, culverts and pipes are clearly shown on the construction plans for Route 81, and are, in part, the area of improvement.

At the time Route 81 was laid out, all the lands which abutted Route 81, and Jumper Road and Route 315, so far as they have any connection with these proceedings, were owned by the Wyoming National Bank of Wilkes-Barre, Trustee of the Phelps Bennett Trust.

The effective date of the condemnation of lands affected by Route 81 was October 5, 1961. The damages to lands owned by Phelps Bennett Trust affected by the construction of Route 81 were determined by condemnation proceedings adjusted prior to November 23, 1962, the date of deed from the trustees of Phelps Bennett Trust to plaintiff. The dates set forth in this paragraph are not to be found in the testimony either before the viewers or before trial court, but are the dates given by counsel for defendant to the viewers

without challenge by plaintiff, and are consistent with all testimony before trial court.

A new drainage pond was created north of Route 315 and east of Jumper Road which covered a part of plaintiff's land. A one-inch rainfall would discharge through the 48-inch pipe 1,900,000 gallons per hour, which according to an engineer witness, "would create a tremendous force, it would cut a ditch of its own, and would move dirt similar to what would happen in hydraulic mining."

The 48-inch pipe was installed in 1963. Plaintiff built a commercial building on his property which fronted on the north side of Route 315. He started his building in 1962 and finished it in 1963.

In August 1964, there was a very heavy rainfall. A witness who went to plaintff's property during the storm said the storm created a five-acre lake estimated at five or six feet deep all around plaintiff's building except the front part and "up towards the front end of the building there were two big whirlpools, that was—that water was just swirling and going say about fourteen feet from the building towards the building, going into the ground. Now, I didn't get too close to it, I wouldn't for nobody on earth, try to get near it because that force, the way it was going underground was terrific, and then there were some (whirlpools) towards the back of the building but they were much smaller.—I couldn't do anything then, the building was just cracking up, the under blocks were beginning to open up and it seemed that all the under blocks were sagging on that one side, and we had one big crack in the back of the building also."

From this testimony it is clear that the engineers believed that run-off water would pond in this area and then would run through natural water courses.

However, it is clear that nature didn't cooperate, the water didn't pond but ran off underground and, in so doing, severely damaged plaintiff's building.

Nothing on the Commonwealth's plans for Route 81 indicated that it took or claimed to take any interest in the ponding area north of Route 315 except the right to discharge water through the 48-inch pipe. Under these circumstances, the Phelps Bennett Trust remained the owner of the ponding area except that the Commonwealth took by necessity the right to discharge water through the 48-inch pipe on to those lands. Nothing prevented the Phelps Bennett Trust or subsequent owners from filling in or using the ponding area so long as they left a channel for water from the 48-inch pipe. The Commonwealth did not acquire, nor does it claim that it acquired, the right to collect waters on the ponding area in such quantity that the weight thereof would create new underground channels and destroy the stability of the surface wherever the new channels might develop. This is exactly what the Commonwealth has done, whether or not they foresaw or intended the result.

The effect of the Commonwealth's action, intended or not, has been to injure and damage and partially destroy plaintiff's property.

This is a case of extensive damage to plaintiff's property not intended or expected by the Commonwealth, but is nonetheless an injury to property for which just compensation must be paid: Griggs v. County of Allegheny, 369 U.S. 84, 82 S. Ct. 531; United States v. Causby et ux., 328 U.S. 256, 66 S. Ct. 1062.

In Causby, the Supreme Court held that the low flights of military planes over a chicken farm as they approached or took off from a government airport made the farm unusable for that purpose and, therefore, there was a taking even though no taking was

intended. In Griggs, the Supreme Court held that low flights of airplanes over residences on their glide or take off patterns rendered residences unusable, and for that damage, intended or not, the county which constructed the airport must pay just compensation.

Under the rule expressed in Sanguinetti v. United States, 264 U.S. 146, 44 S. Ct. 264, the overflow created by the 48-inch pipe was the direct result of the construction of Route 81 and constituted a permanent invasion of the land amounting to an appropriation of plaintiff's land. The amount of the overflow into plaintiff's land was proven to be severe and permanent. Plaintiff's building was so damaged that his customary use of the building was prevented until extensive repairs were made.

In this case, the State of Pennsylvania did not intend to injure or destroy plaintiff's property which was, in fact, a part of the ponding area reclaimed by a deep fill. The property was built at the same time as the Commonwealth constructed Route 81. Construction of plaintiff's property was begun in 1962 and finished in 1963. The 48-inch pipe was placed under Route 315 in 1963. The storm which caused the damage occurred in August of 1964.

The Eminent Domain Code of June 22, 1964, P. L. 84, 26 PS §1-101, et seq., became effective September 1, 1964. This would create difficult problems if we were here dealing with consequential damage, but the damage to plaintiff's property was the direct result of the Commonwealth discharge of large quantities of storm water on and around plaintiff's property. This damage occurred when the Commonwealth of Pennsylvania through its Department of Highways substantially injured plaintiff's property by which his beneficial use of his land was partially destroyed.

A taking occurs when the entity clothed with the

720

power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property: Griggs v. Allegheny County, supra.

Causby and Griggs establish what has been termed "inverse" condemnation. The earlier law in this State was to the effect that where no part of a property was directly taken by the condemnor, no damages could be recovered except in those cases where consequential damages were permitted. Whether a property was directly taken or injured had to be determined from the declaration of taking, or from a study of the maps and plans which delineated the taking. Under Causby and Griggs the test is: Was the owner substantially deprived of the beneficial use and enjoyment of his property, and if so, the governmental body causing the deprivation must compensate the owner, and the cause of action arises when the deprivation occurred.

## ORDER

And now, to wit, July 7, 1972, the order entering a compulsory nonsuit is vacated.