B & G ENTERPRISES, LTD., Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 98–598 C.

United States Court of Federal Claims.

May 4, 1999.

The payment of money by the United States is not involved here and, hence, the subpoena power in Rule 14(a)(2) does not apply.

Douglas B. McFadden, McFadden, Shoreman & Tsimepedes, P.C., Washington, D.C., for plaintiff.

Mark A. Melnick, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

HODGES, Judge.

This case is before the court on cross motions for partial summary judgment.[1] Plaintiff claims that a California law effectively banning the use of cigarette vending machines in all but certain specified locations is attributable to the Federal Government, and that this constitutes a Fifth Amendment taking. Defendant contends that the Substance Abuse Prevention and Treatment Block Grant Program does not create a taking merely because the Government conditioned receipt of the grant on the states' meeting certain minimum criteria approved by the Secretary of Health and Human Services. Plaintiff has not demonstrated that the Government acted affirmatively to deprive it of property or to interfere with its property rights. We grant defendant's motion for partial summary judgment.·

## BACKGROUND

Plaintiff owns and operates cigarette vending machines located in business establishments in Los Angeles and surrounding areas. The California Legislature passed a law in 1994 effectively banning cigarette vending machines from all premises except those licensed to sell alcoholic beverages by the Department of Alcoholic Beverage Control.[2] Because of that law, plaintiff's contracts with commercial businesses for placement of cigarette vending machines were canceled.

Plaintiff contends that the Federal Government caused California to place restrictions on cigarette vending machines through the Alcohol, Drug Abuse and Mental Health Organization Act, adopted by Congress in 1992.[3] This Act allows the Secretary of Health and Human Services to make block grants to states under certain conditions. The state must have a law providing that it is "unlawful for any manufacturer, retailer, or distributor of tobacco products to sell or distribute any such product to any individual under the age of 18." 42 U.S.C. § 300x–26(a)(1).

The Act requires that each state receiving funds enforce the law as follows:

(A) annually conduct random, unannounced inspections to ensure compliance with the law . . . and

(B) annually submit to the Secretary a report describing—

(i) the activities carried out by the State to enforce such law during the fiscal year preceding the fiscal year for which the State is seeking the grant;

(ii) the extent of success the State has achieved in reducing the availability of tobacco products to individuals under the age of 18; and

(iii) the strategies to be utilized by the State for enforcing such law during the fiscal year for which the grant is sought.

Failure to comply with the statute results in a reduction of funds for the first fiscal year by 10 percent, and up to 40 percent by the third fiscal year. 42 U.S.C. § 300x–26(c).

---

1. Plaintiff filed suit alleging a taking based on two theories. First, plaintiff contends that the United States Food and Drug Administration adopted regulations that impermissibly restricted the location of cigarette vending machines. This issue is staved pending the resolution of *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155 (4th Cir.1998), *cert. granted*, —— U.S. ——, 119 S.Ct. 1495, 143 L.Ed.2d 650 (1999) (No. 98–1152). The second theory is not dependent on the Fourth Circuit matter, so we removed it for consideration pursuant to Rule 1.

2. Cal.Bus. & Prof.Code § 22960.

3. 42 U.S.C. § 300x–21; 42 U.S.C. § 300x–26.

The state is expected to enforce the law in a manner that "can reasonably be expected to reduce the extent to which tobacco products are available to individuals under the age of 18." 42 U.S.C. § 300–26(b)(1).

The Secretary of HHS issued final regulations in January 1996. 45 C.F.R. § 96.130. The regulations restate the conditions set out in the statute. They describe actions that the state should take to enforce the law restricting sale and distribution of tobacco products to individuals under age 18. States are required to conduct a "reasonable number of random, unannounced inspections" for the first and second years of the grant. 45 C.F.R. § 96.130(c). The state must conduct random inspections of over-the-counter and vending machine outlets that cover a wide range of locations in the third and subsequent years. 45 C.F.R. § 96.130(d)(1). The inspections must be conducted annually to provide a probability sample of outlets. "The sample must reflect the distribution of the population under age 18 throughout the State and the distribution of the outlets throughout the State accessible to youth." 45 C.F.R. § 96.130(d)(2). Progress reports must be submitted outlining state activities and success achieved in reducing availability of tobacco products to children. Failure to comply results in a reduction in the grant amount.

## DISCUSSION

Plaintiff argues that California's *de facto* ban on cigarette vending machines is attributable to the Federal Government. This action resulted in plaintiff's loss of contracts with commercial businesses for placing vending machines on their premises, and thus constitutes a regulatory taking under the Fifth Amendment. California passed legislation to qualify for federal block grants. By enacting this law requiring placement of cigarette vending machines in specified locations, California became an agent of the Federal Government for purposes of enforcing federal policy, according to plaintiff. Plaintiff cites two cases to support this argument: *Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991) and *Preseault v. United States,* 100 F.3d 1525 (Fed.Cir.1996).

In *Hendler,* the EPA issued an administrative order granting to itself and to the State of California access to the plaintiffs' property to construct and maintain groundwater monitoring wells. *Hendler,* 952 F.2d at 1369. EPA contractors installed five monitoring wells on the plaintiffs' property; the State of California installed at least thirteen more. *Id.* at 1369–70. Plaintiffs argued that EPA's actions constituted a taking of their property and that the activities of the State of California were attributable to the Federal Government. The Government argued that it could not be held liable for the actions of the State of California.

The court held that California state officials entered the plaintiffs' land under authority granted by the Federal Government. The activities of the state within the scope of the order were attributable to the Federal Government for purposes of the takings claim. *Id.* at 1379. The court found that "California officials were acting under the authority of the 1983 Order, and in pursuance of the State's formal Cooperative Agreement with the Government to assist in carrying out Superfund activities ... with substantial funding from the Government." *Id.*

In *Preseault,* the State of Vermont converted a long unused railroad right-of-way into a recreational hiking and biking trail under authority of the Rails–to–Trails Act and by order of the Interstate Commerce Commission. *Preseault,* 100 F.3d at 1529. Plaintiffs, owners of the underlying fee simple estate, filed suit against the Federal Government seeking just compensation under the Fifth Amendment. *Id.*

The Government defended on the ground that because the City of Burlington actually established the trail, the United States should not be the responsible party. *Id.* at 1551. In other words, either the city or the state was liable, not the United States. The court compared this action to the action discussed above in *Hendler,* and found that the city occupied the plaintiffs' property under the Federal Government's authority pursuant to the ICC order. *Id.* This amounted to a taking for which the Government was liable.

*Hendler* and *Preseault* both involved a physical entrance upon land owned by another pursuant to federal authority. EPA agents entered Hendlers' land with an EPA order issued pursuant to federal law. The state was acting as an agent of the Federal Government. Similarly, in *Preseault* construction crews entered Preseaults' land armed with an ICC order. The court found that Vermont and the United States "were fully invested in the effort to create [a] public trail." *Preseault*, 100 F.3d at 1551. Neither case involved federal block grants.

Defendant here established a program whereby states would be eligible for federal grants if they met certain conditions. The program was designed to encourage states to limit underage tobacco use. Defendant wanted to implement federal policy through the states, but the means for promoting that policy were left to the states.

The Supreme Court considered a takings claim similar to this one in *Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). Allegheny County owned and maintained the Greater Pittsburgh Airport on land purchased to provide airport facilities. The airport was designed to conform with the rules and regulations of the Civil Aeronautics Administration within the scope of the National Airport Plan pursuant to 49 U.S.C. § 1101. It directed the Administrator to prepare and revise a "national plan for the development of public airports." *Griggs*, 369 U.S. at 85, 82 S.Ct. 531. The Administrator was authorized to make grants to "sponsors" for this purpose. The receipt of such funds was conditioned upon the sponsors' obtaining title to lands necessary for landing airplanes, and their acquiring such easements or other interests in lands and air space as needed to comply with airport approach standards determined by the Administrator. *Id.* at 86, 82 S.Ct. 531. Plaintiff's land was located so close to the northeast runway that the property was rendered unlivable. *Id.* at 86–88, 82 S.Ct. 531.

The Supreme Court rejected plaintiff's taking argument. The Court found that the "[County] decided, subject to the approval of the C.A.A., where the airport would be built, what runways it would need, their direction and length, and what land and navigation easements would be needed. The Federal Government takes nothing; it is the local authority which decides to build an airport *vel non*, and where it is to be located." *Id.* at 89, 82 S.Ct. 531.

In *Griggs*, the Federal Government conditioned receipt of the funds on the state's meeting certain requirements. The state was free to meet those requirements however it thought best. Just as the county in *Griggs* could have built the airport in another location or changed the placement of the landing area, so could California have chosen a different method for preventing minors from obtaining tobacco products. The fact that the Government approved and funded the plan makes no difference absent a showing that California somehow was compelled or coerced into restricting the location of the vending machines.

The Government in *Griggs* imposed more onerous conditions than those imposed by HHS in this case. While the county was responsible for the airport's design, including the location of its takeoff and approach areas, the regulatory scheme enacted by Congress and administered by the Agency regulates virtually every aspect of air transit. *Id.* at 91, 82 S.Ct. 531 (Black, J., dissenting). "These airspaces are so much under the control of the Federal Government that every takeoff from and every landing at airports such as the Greater Pittsburgh Airport is made under the direct signal and supervisory control of some federal agent." *Id.* at 92–93, 82 S.Ct. 531. The Court's majority however, determined that the far-reaching federal supervision and control present in *Griggs* was insufficient to hold the Government liable for a taking.

Other parties have contended that the states' acquisitions of necessary rights-of-way that involved federal aid pursuant to the Interstate Highway Program were takings by the Federal Government. *D.R. Smalley & Sons, Inc. v. United States*, 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied*, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967); and *Custom Contemporary Homes, Inc. v. United States*, 5 Cl.Ct. 88 (1984). Both decisions emphasized that the Government must take some

affirmative action for a takings claim to be successful. The United States cannot be held liable if private property is taken by acts or omissions of the state. *D.R. Smalley,* 178 Ct.Cl. at 599, 372 F.2d 505; see also *Custom Contemporary Homes,* 5 Cl.Ct. at 90. The court in *D.R. Smalley* stated:

> The National Government makes many hundreds of grants each year to the various states, to municipalities, to schools and colleges and to other public organizations and agencies for many kinds of public works, including roads and highways. It requires that the projects to be completed in accordance with certain standards before the proceeds of the grant will be paid. Otherwise the will of Congress would be thwarted and taxpayers' money would be wasted.

*Id.* at 597–98, 372 F.2d 505.

Louisiana property owners filed suit alleging an unconstitutional taking because of flood-plain ordinances passed by the Plaquemines Parish Commission Council. *Adolph v. Federal Emergency Management Agency,* 854 F.2d 732 (5th Cir.1988). The parish passed these ordinances to participate in FEMA's National Flood Insurance Program. The federal goal under the flood program was to provide subsidized flood insurance to those existing structures in flood-prone areas, while discouraging future unsafe construction in those areas. *Id.* at 734 n. 2. FEMA required that all new or additional structures in a flood-prone area meet certain elevation requirements. *Id.* at 734.

"By conditioning the availability of federal-subsidized insurance upon enactment of local flood-plain management ordinances in accordance with federal standards, the NFIP represents a voluntary federal program." *Id.* at 735; citing *Texas Landowners Rights Ass'n v. Harris,* 453 F.Supp. 1025, 1030 (D.D.C. 1978), *aff'd mem.,* 598 F.2d 311 (D.C.Cir.), *cert. denied,* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979). The court notes that the parish was not compelled to participate in the NFIP, so FEMA could not be charged with

an unconstitutional taking. *Id.* at 736. Neither unconstitutional conditions attached to the benefits nor coercion by the Government were present.

Congress may encourage state participation in federal programs by attaching conditions to federal funds. *Adolph,* 854 F.2d at 735–36. Compliance with these conditions usually is not equated with federal coercion. Id. at 736 n. 3.[4] It is true that withholding funds may threaten a state's well being because federal legislation crosses the line between inducement and coercion in some circumstances. *See Montgomery County, Maryland v. Califano,* 449 F.Supp. 1230, 1247 (1978), *aff'd* 599 F.2d 1048 (4th Cir.1979). But this is not such a situation.

This federal anti-smoking statute mandated broad policy objectives, then passed responsibility for implementation and supervision of the program to Health and Human Services. HHS set minimum standards for participation in the block grant program, and made some suggestions for meeting those standards. The states were free to accept or reject the offer. The procedure for meeting these standards was left to the states. States were encouraged to develop and implement a plan to enforce the law. Noncompliance meant a reduction in funding of up to 40 percent. The Federal Government's involvement is qualitatively different from the action in either *Hendler* or *Preseault.*

Plaintiff implies that the proposed regulations issued by the Secretary in 1993 demonstrate that the Federal Government somehow compelled California to enact a law restricting the location of tobacco vending machines because they attached a model law. But it was a "proposed model statute." It was not required. The final regulations issued in 1996 did not outlaw the sale of cigarettes from vending machines to adults, or restrict their location.

When a state acts in its sovereign capacity and a taking occurs, the state is responsible. It does not matter whether its actions taken

---

**4.** The case that the Fifth Circuit relies on is *Steward Machine Co. v. Davis,* 301 U.S. 548, 589–590, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). That case involved an excise tax. The Supreme Court stated, "to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties." *Id.* at 589–90, 57 S.Ct. 883.

were pursuant to a plan approved by a federal agency.

## CONCLUSION

The Government may establish conditions or standards for the states to meet to qualify for federal grants. The states are free to reject or meet those conditions. Absent some affirmative act by the Government, or compulsion or coercion, no state action that results in a taking may be attributed to the United States. HHS regulations did not compel the State of California to ban cigarette vending machines. The state made this decision on its own. The model statute created by HHS was just that—a model. The model offered suggestions that the states might wish to consider or to implement. Defendant's motion for partial summary judgment is GRANTED.