THE VILLAGE OF BENSENVILLE et al., Plaintiffs-Appellants, v. THE CITY OF CHICAGO, Defendant-Appellee.

(No. 57070; ▮▮▮▮▮▮▮

First District (1st Division)—December 28, 1973.

Shaheen, Lundberg and Callahan, of Chicago (James J. O'Meara, Jr., of counsel), for appellants.

Richard L. Curry, Corporation Counsel, of Chicago (William R. Quinlan and Richard F. Friedman, Assistant Corporation Counsel, of counsel), for appellee.

Mr. JUSTICE HALLETT delivered the opinion of the court:

The four plaintiff and intervenor municipalities appeal from the dismissal of their suit to enjoin the City of Chicago from expanding its airport facilities at O'Hare in such a manner as to intensify the existing noise and air pollution caused by and arising out of its operation of said airport.

Although many issues are raised and argued at length (such as whether the complaint states a cause of action, whether a court of equity has jurisdiction to enjoin a city's operation of an airport where such operation is legal and not negligent, whether the municipalities must first exhaust their administrative remedies and whether the action is barred by the failure of the plaintiffs to give the statutory notice under the Local Government Tort Immunity Act), in our considered opinion the controlling issue here is—whether the United States, under the Supremacy and Commerce clauses of the Constitution, has, through the Federal Aviation Act, as now supplemented by the Noise Control Act of 1972 and regulations issued thereunder, so occupied the regulation of aircraft noise and air pollution as to preempt any state or local action in that field.

We answer that inquiry in the affirmative and therefore affirm.

Although there were in the trial court other counts (involving home owners and various airline companies), those matters are not joined in this appeal, which involves only Count I.

The said count alleges, in substance, that the plaintiff municipalities are located contiguously to and within the environs of the O'Hare International Airport, which is physically located in the counties of Cook and Du Page and is owned and operated by the defendant City of Chicago; that the City has developed the said airport, through the construction of runways, taxiways, ramps and service facilities for both passenger and cargo, to the extent that it is the busiest airport in the world; that the air transport carriers using said facilities operate many jet aircraft powered by liquid fueled engines which produce and emit intensive noise and air pollution over and upon said municipalities and their constituents; that said noise and air pollution are of such an intensity as to be harmful, dangerous and damaging to the physical and mental health of said constituents; that each of said municipalities has enacted resolutions declaring the said conditions, created in and over and upon their respective territorial limits, a public nuisance; and that the City has recently undertaken to expand said airport by adding to the number and length of its runways and supporting facilities, which will intensify and

further increase said deleterious effects on the said constituents.

The plaintiffs prayed that the City be enjoined "from expanding its facilities at O'Hare in such a manner as to provide facilities for additional usage by noise and air-polluting aircraft and for such other relief as this court in equity deems proper." This general prayer was expanded during the hearings by the plaintiffs' suggestion that the court's decree include the following injunction:

"1. The said City shall not after the date of this Injunction offer by sale, lease or otherwise, any facilities of any nature at O'Hare International Airport to or for the use of any aircraft carrier, for passengers or for cargo, nor to any charter or private aircraft owner or operator, which facilities shall be used by aircraft which produce noise in excess of 82 dba (or such other standard deemed reasonable by the Court and gleaned from expert evidence submitted by the plaintiffs or others.)

2. Said airport operator shall not permit any aircraft which produces noise in excess of 82 dba (or such other standard deemed reasonable by the Court and gleaned from evidence submitted by the plaintiffs or others) to use its facilities at O'Hare unless such aircraft was in use by the owner thereof prior to the date of this injunction. This prohibition shall not apply in cases of emergency or those effecting the national defense."

The City moved to dismiss on various grounds and the court granted said motion and dismissed all complaints. The only appellants are the four municipalities and their appeal, as we have noted, relates only to the dismissal of Count I above abstracted.

As above indicated, despite language relating to the expansion of runways and supporting facilities, the real thrust of the plaintiffs' complaint is to prohibit (by a "Tinker to Evers to Chance" combination of a court decree upon the City to control the airlines) aircraft from producing noise or emitting fumes (while in flight over their territorial boundaries) in excess of certain limits to be fixed by the Illinois Chancery Court.

The United States Supreme Court has recently (May 14, 1973), in *City of Burbank v. Lockheed Air Terminal, Inc.*, —— U.S. ——, 36 L.Ed.2d 547, 93 S.Ct. 1854, passed on the general problem here presented.

There the city council of Burbank adopted an ordinance which made it unlawful for a so-called pure jet aircraft to take off from the Hollywood—Burbank Airport between 11 P.M. of one day and 7 A.M. the next day and making it unlawful for the operator of that airport to allow any such aircraft to take off from that airport during such periods. The said operator and Pacific Southwest Airlines (which had such a

flight at 11:30 P.M.) brought suit to enjoin the enforcement of said ordinance and the District Court did so, finding the ordinance unconstitutional on both Supremacy Clause and Commerce Clause grounds. On appeal, the United States Supreme Court, in a five to four opinion, affirmed, and speaking through Mr. Justice Douglas, at 1856, 1857, 1859, 1860, 1862 and 1863 (omitting footnotes), said:

"The Federal Aviation Act of 1958, 72 Stat. 737, 49 U.S.C. § 1301 *et seq.*, as amended by the Noise Control Act of 1972, 86 Stat. 1234, and the regulations under it, 14 CFR Pts. 71—77, 91—97, are central to the question of pre-emption.

Section 1508 provides in part, 'The United States of America is declared to possess and exercise complete and exclusive national sovereignty in the airspace of the United States * * *.' By § 1348 the Administrator of the Federal Aeronautics Act (FAA) has been given broad authority to regulate the use of the navigable airspace, 'in order to insure the safety of aircraft and the efficient utilization of such airspace * * *' and 'for the protection of persons and property on the ground * * *.'

\* \* \*

As stated by Judge Dooling in *American Airlines v. Hempstead*, 272 F.Supp. 226, 230, aff'd, 398 F.2d 369:

'The aircraft and its noise are indivisible; the noise of the aircraft extends outward from it with the same inseparability as its wings and tail assembly; to exclude the aircraft noise from the Town is to exclude the aircraft; to set a ground level decible limit for the aircraft is directly to exclude it from the lower air that it cannot use without exceeding the decible limit.'

\* \* \*

The original complaint was filed on May 14, 1970; the District Court entered its judgment November 30, 1970; and the Court of Appeals announced its judgment and opinion March 22, 1972—all before the Noise Control Act of 1972 was approved by the President on October 22, 1972. That Act reaffirms and reinforces the conclusion that FAA, now in conjunction with EPA, has full control over aircraft noise, preempting state and local control.

\* \* \*

It is the pervasive nature of the scheme of federal regulation of aircraft noise that leads us to conclude that there is pre-emption. As Justice Jackson stated concurring in *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303:

'Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal

permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls.'

Our prior cases on preemption are not precise guidelines in the present controversy, for each case turns on the pecularities and special features of the federal regulatory scheme in question. Cf. *Hines v. Davidowitz*, 312 U.S. 52; *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440. Control of noise is of course deep-seated in the police power of the States. Yet the pervasive control vested in EPA and in FAA under the 1972 Act seems to us to leave no room for local curfews or other local controls. What the ultimate remedy for aircraft noise which plagues many communities and tens of thousands of people is not known. The procedures under the 1972 Act are underway.[21] In addition, the Administrator has imposed a variety of regulations relating to takeoff and landing procedures and runway preferences. The Federal Aviation Act requires a delicate balance between safety and efficiency, 49 U.S.C. § 1348 (a), and the protection of persons on the ground. 49 U.S.C. § 1348 (c). Any regulations adopted by the Administrator to control noise pollution must be consistent with the 'highest degree of safety.' 49 U.S.C. § 1431 (d) (3). The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled.

If we were to uphold the Burbank ordinance and a significant number of municipalities followed suit, it is obvious that fractionalized control of the timing of takeoffs and landings would severely limit the flexibility of the FAA in controlling air traffic flow.[22] The difficulties of scheduling flights to avoid congestion and the concomitant decrease in safety would be compounded. In 1960 the FAA rejected a proposed restriction on jet operations at the Los Angeles airport between 10 P.M. and 7 A.M. because such restrictions could 'create critically serious problems to all air transportation patterns.' 25 Fed. Reg. 1764-1765. * * *

* * *

This decision, announced in 1960, remains peculiarly within the competence of the FAA, supplemented now by the input of the EPA. We are not at liberty to diffuse the powers given by Congress to FAA and EPA by letting the States or municipalities in on the planning. If that change is to be made, Congress alone must do it."

While that case involved only aircraft noise and did not include air pollution, we conclude that this is a distinction without a difference and that this decision controls our disposition of the instant case.

As a result, we conclude that the United States, under the Supremacy and Commerce clauses of the Constitution, has, through the Federal Aviation Act, as now supplemented by the Noise Control Act of 1972 and the regulations issued thereunder, so occupied the regulation of aircraft noise and air pollution as to pre-empt any state or local action in that field. This does not, however, leave either the plaintiff municipalities or their constituents without remedies. Both can take appropriate action before the Environmental Protection Agency (EPA) and the Administrator of the Federal Aeronautics Act (FAA) and the constituents, as landowners may, in proper cases, have actions at law against the City, as airport operator, on the theory of inverse condemnation. *United States v. Causby* (1946), 328 U.S. 256, 90 L.Ed. 1206, 66 S.Ct. 1062; *Griggs v. Allegheny County* (1962), 369 U.S. 84, 7 L.Ed.2d 585, 82 S.Ct. 531.

We therefore affirm the judgment of the circuit court, dismissing the municipalities' suit to enjoin the City of Chicago from expanding its airport facilities at O'Hare International Airport.

Judgment affirmed.

GOLDBERG and EGAN, JJ., concur.