La Salle National Bank, Trustee, Plaintiff-Appellant, *v.* The County of Cook, Defendant-Appellee.—(The Village of Glenview *et al.*, Intervenors-Defendants-Appellees.)

(No. 59771;

First District (2nd Division)—November 18, 1975.

Thomas T. Burke, of Chicago (John O. Tuohy, of counsel) for appellant.

Bernard Carey, State's Attorney, of Chicago (Sheldon Gardner, Stuart D. Gordon, Jerome S. Schain, and John Richards Lee, Assistant State's Attorneys, of counsel), for appellee County of Cook.

Zachary D. Ford, of Glenview, for appellees Village of Glenview et al.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

Plaintiff, as trustee for the owners of the property in issue, applied to the Cook County Zoning Board of Appeals for a reclassification of its property from M-1 (Restricted Manufacturing) to R-6 (General Residential)[1] with a special use to build a multiple-family residential development. The Board of Appeals, after public hearings, recommended that the request be denied. The Cook County Board of Commissioners (County) denied the request. Thereupon plaintiff filed a complaint in the circuit court for a declaratory judgment challenging the constitutionality of the Cook County Zoning Ordinance (ordinance) as applied to plaintiff's property and requesting that the circuit court declare that plaintiff has the right to use its property for a residential planned development consisting of 1,533 units, 17 units per acre, in buildings from two to eight stories in height. After an answer by the County of Cook, the nearby Villages of Glenview, Northbrook and Northfield were allowed to intervene as defendants (County and Villages hereafter defendants). Judgment was entered for defendants after a bench trial with the court holding that the applicable ordinance, as applied to the subject property, was valid and constitutional in all respects.

Plaintiff, on appeal, raises the following issues: (1) may the County enforce height restrictions for airspace approaches to the Glenview Naval

---

[1] Cook County Zoning Ordinance, §§ 8.3—6(1), 10.3—1.

Air Station (Station) which are different than those of the Federal Aviation Agency (FAA); (2) is the "County Airport Zoning Ordinance"[2] void because it deprives the plaintiff of the use of its property without compensation and thus is an unconstitutional taking; and (3) as applied to plaintiff, does the ordinance violate due process of law. In addition to these issues defendants have properly raised the following additional issue: (4) whether plaintiff's failure to argue on appeal the unconstitutionality of the County's refusal to change the classification of the subject property precludes this court from reviewing the merits of that claim.

During the trial of this case, plaintiff presented evidence to attack the two provisions of the ordinance which prevent plaintiff's proposed development. First, the M-1 Restricted Manufacturing zoning classification prevents the erection of the residential planned development consisting of 1,533 residential units, and secondly, the restrictions set forth in section 4.11 of the zoning ordinance limits the height of buildings surrounding certain airports including the Glenview Naval Air Station which is nearby plaintiff's property.[3] However, as we understand plaintiff's briefs and oral argument, this appeal challenges the trial court's judgment only so far as section 4.11 prohibits plaintiff from obtaining the relief requested. Accordingly, our summary of the evidence will address itself primarily to plaintiff's theory with such additional evidence as is necessary to dispose of all the issues before this court.

The subject property, owned by the Lutter family and one Carl Lembrick, was used by them for the excavation of clay to manufacture bricks from about the turn of the century to 1941. It was thereafter used until about 1963 to 1965 as an uncontrolled garbage dump. From that time until the trial, it was used for the dumping of clean fill, such as clay

---

[2] Throughout its briefs in this court, plaintiff refers to a "Cook County *Airport* Zoning Ordinance." So far as we can determine, there is no such ordinance. Section 4.11 of the Cook County Zoning Ordinance deals with special height restrictions for property located in the vicinity of airports and is involved in this appeal.

[3] Cook County Zoning Ordinance, section 4.11, reads as follows:

"4.11 HEIGHT REGULATIONS IN THE VICINITY OF AIRPORTS. The following special height limitations shall apply to areas within two (2) miles of the boundary lines of Midway, O'Hare, and Glenview Naval Air Station airports:

(a) Within 7,500 feet from the nearest airport boundary, no building, structure, object of natural growth, or portion thereof shall exceed a height above curb level of twenty-five (25) feet, or one foot for every fifty (50) feet that such building, structure, or object is distant from such nearest boundary or boundaries, whichever height is greater.

(b) Between 7,500 feet and two (2) miles from the nearest airport boundary, no building, structure, object of natural growth, or portion thereof shall exceed a height above curb level of 150 feet."

and cement. The evidence tended to establish that due to the uncontrolled nature of the dumping on the property for 20 years, the site was "undesirable" due to the absence of both daily compacting and insertion of layers of clean fill.

The subject property is presently vacant, irregularly shaped, consists of approximately 91 acres in an unincorporated area of the county and is generally adjacent to the Village of Glenview. To the north is more vacant land, a portion of which at the time of the trial was being developed as a golf course. Adjoining the property to the east is the north branch of the Chicago River and east of the river is a planned development residential area known as Valley Lo with a density of three units per acre. Immediately adjoining the subject property at the southeast corner is the Immanuel Lutheran Church and school; Chestnut Avenue borders the property on the south and on the south side of Chestnut Avenue is a cemetery and a mixture of residential, commercial and industrial uses and zoning. Further south and east of Chestnut is the Tall Trees residential development containing single-family residences with an average value of $90,000. Adjoining the property to the west, the land is zoned and partially developed with manufacturing uses, the right-of-way of the Chicago, Milwaukee and St. Paul Railroad, Lehigh Avenue, then across Lehigh a mixture of manufacturing, commercial and residential uses in a manufacturing zoned district and then the Naval Air Station.

Plaintiff sought the zoning change to satisfy a condition precedent to a $4,000,000 contract it had entered into, on behalf of the Lutters, with Kenroy, Inc., for the sale of the property. Kenroy intended to build the proposed development which was to consist of nine buildings of varying heights and accompanying facilities. The height of the tallest building was to be 72 feet. The height of the buildings would exceed the height allowed under the ordinance in varying amounts from 10 feet to 38 feet.

At trial, plaintiff introduced a letter it received from the FAA indicating the proposed construction did not violate the height restrictions imposed by FAA on buildings in military airport approach zones.[4] (14 C.F.R. § 77.28(b)(3).) In support of its contention that section 4.11 of the ordinance was arbitrary and unreasonable, plaintiff called an air-

---

[4] The letter dated June 8, 1973, pointed out that the building site is within an area where noise pollution from Naval Air Station aircraft will present a serious problem; that the proposal is in direct conflict with FAA efforts to reduce noise pollution at this and other existing airports. The letter also stated the Department of the Navy strongly objected to the proposed construction because of its proximity to the Station.

space consultant who had, prior to 1953, worked for the Civil Aeronautics Administration (predecessor to the FAA) mainly in the area of utilizing airspace near airfields so as to avoid hazards. The consultant, Frank Lappas, stated his opinion that none of the proposed buildings constituted an air hazard within the FAA definitions and that the zoning ordinance has no reasonable relationship to safety, health or welfare; he further testified that an eight-story building on the subject site would not constitute an air navigation hazard under FAA standards.

Lappas testified that section 4.11 of the zoning ordinance was arbitrary in that it pertains to distances from the boundary of an airport without consideration of runway configurations, clearances in approach zones and the conduct of safe operations. He based his opinion on calculations he had completed from published information on the approaches at the Station and from his observations on the one visit he made to the site on a Monday or Tuesday. Lappas admitted he neither observed the flight patterns in and out of the Station on weekends or discussed the proposed construction with anyone at the Station. When questioned as to emergency situations in relation to buildings as air hazards, Lappas at first contended he could not conceive of an emergency situation developing in which a one-story building would be less of an air hazard than an eight-story building. He asserted he would not change his opinion upon being informed emergency situations at the Station occur on a weekly basis. Additionally, though Lappas initially believed only one missed approach zone existed near the subject property, he said it would not bother him "in the least" to find that many missed approaches fly over the property. Lappas acknowledged he had no personal experience either in piloting a plane or in air traffic control.

Defendants presented Captain Paul Gene Merchant, Commanding Officer of the Station, and Lieutenant Tom Baker, Air Traffic Control Facility Officer at the Station in support of their contention the ordinance was not arbitrary and was reasonably related to public safety. Captain Merchant testified the weekend air traffic was the heaviest and that he considered the proposed development to be located in a heavy hazard zone. He further asserted that the FAA standards do not properly consider the different circumstances involved in an emergency situation and that, during such situations, all structures are hazards, especially those over 50 feet. Lieutenant Baker testified he believed the restrictions of the zoning ordinance were necessary for the safety of both pilots and the citizens of the community and that missed approaches definitely take airplanes over the subject property. He also asserted that in emergency situations, pilots cannot hold to the approach limitations expected of

them though the expectations are the basis of the Federal regulations at issue here.

At various times in the course of the trial, a 1968 airplane crash near the subject property was referred to and the trial court commented on the crash orally at the end of the trial.

As to the zoning classification change requested, plaintiff presented a transportation planner who testified the proposed development of 1,533 units would have 2,700 cars with approximately 9,000 trips in and out per day; that the only access to the site is from the two-lane Chestnut Avenue which borders the property on the south; that Chestnut Avenue which has outlets on Lehigh and Waukegan Avenue would have to be widened to four lanes with additions to Lehigh and Waukegan Avenue, all necessary to accommodate the increase in traffic; and that the proposed changes had not been discussed with the State and county which have jurisdiction over the roadways.

A city planner testifying for the plaintiff projected the proposed development would generate 627 elementary and 144 high school students; that he did not know if the existing schools could accommodate the increase; and, after considering the estimated costs and revenues for the elementary school, the project would generate an annual tax surplus of $433,852.

Plaintiff presented a soil engineer who testified that the soil borings on the site indicated the soil consists of a garbage type fill anywhere from 8 to 15 feet thick with the deepest point approximately 60 feet deep; that methane gas was found in one of three borings with gas in a ratio of 32 parts per million. A professional engineer, Dr. David J. Hagerty, testified on behalf of the plaintiff regarding methane gas as produced in a garbage dump and the problems of building on such a site. Hagerty, retained by the plaintiff only to testify, stated that methane gas, which is odorless, invisible and potentially highly flammable or explosive, will be produced, that it would be necessary to provide venting or air space and that the dangers presented by the potentiality of methane gas could be forestalled only by the most careful construction and maintenance, including apparent freedom from future negligence by maintenance personnel as well as complete and continuing ventilation of the proposed buildings.

Plaintiff's witness, Carl Kupfer, President of Site Planning and Civil Engineering Corporation, testified that the condition of the soil creates two problems: foundation support and methane gas; that no architectural or structural plans were prepared for the site; that the FAA notified the plaintiff the proposed development is within an area where noise pollution is generated by aircraft operated at the Station and will present a

serious problem; and that the proposed development would be serviced by a two-well water system.

Defendants' witnesses testified the methane gas would seep into even the most carefully constructed buildings. Harold Schneider, an architectural and structural engineer, testified on behalf of the defendants that methane gas may be generated in the subject site for decades; that on a long-term basis, the feasibility of developing the proposed use in a safe manner is such that it cannot be done; and that in his opinion the most practical use of the subject site is one that does not involve closed buildings wherein the danger of explosion due to methane gas would be very possible.

Marvin A. Salzenstein, a consulting engineer, testified that there are two problems, gas generation and soil shrinkage, created by construction over a landfill. He also asserted that extraordinary air pollution problems would result from the proposed use with no effective method of treating the soil to avoid the air pollution, but that if the site were to be used as a park, the air pollution would not exist. In addition, defendant presented testimony concerning the existing traffic in the nearby Valley Lo and Tall Hills residential subdivisions and the possible increase in traffic in the Tall Trees area which would develop with the implementation of the instant proposal. Defendants' witnesses also alleged the amount of pupils generated by the proposed development would not be paid for by the property taxes expected from the residents of the development and that the then existent school facilities were either at their maximum capacity or overcrowded and not able to accommodate existing needs much less those created by the proposed development.

Plaintiff's experts testified that the property as zoned and in its present condition has a market value of between $900,000 and $1,100,000; that its highest and best use was for a multiple-family development of some kind and on that basis the market value of the property would be approximately $3,800,000; that if the property remained as zoned it could be successfully developed for industrial purposes; and that the proposed project would not have a deleterious effect on surrounding property. On the same subject defendants' experts testified that the property under its present zoning and with the soil conditions has a market value of approximately $2,000,000 and if rezoned as plaintiff requested the market value would be approximately $4,000,000; that the highest and best use of the site is M-1 Light Manufacturing Industrial Park; and that the proposed use would be detrimental to the surrounding and existing residential uses.

Testimony offered by the plaintiff as to planning was that the highest and best use of the site is a planned residential development consisting

of multiple-family structures under the R-5 zoning classification[5] and that the property can be developed under its present zoning classification. The defendants' planning witness testified that the highest and best use for the subject property would be the type of uses permitted in the M-1 district which have a low land coverage involving outdoor storage and minimal utilization of the ground; and that the proposed development is totally inappropriate for the subject property.

Defendants offered testimony to the effect that a residential development on the proposed site would be unacceptable from a noise standpoint; and that due to the aircraft traffic in the area and particularly from the Station, substantial noise complaints would be received.

I.

We first consider the issue paramount to the plaintiff in its brief, whether the County may impose and enforce height restrictions for airspace approaches to the Station which differ from those imposed by the FAA.

The County has set forth in its zoning ordinance special height limitations for areas within two miles of certain designated airports, one of which is the Station. The Illinois legislature in 1935 gave to the counties, for the purpose of promoting the public health, safety, morals, comfort and general welfare, a number of rights in the field of zoning land, including the power to regulate and restrict the location and use of structures including the height of buildings. (Ill. Rev. Stat. 1935, ch. 34, par. 152i.) This power presently set forth in section 1 of "An Act in relation to county zoning" (Ill. Rev. Stat. 1973, ch. 34, par. 3151) is the legislative grant of authority for the County to adopt its zoning ordinance.

The County, in the first zoning ordinance adopted following the 1935 legislative action, included a provision (section 15) to restrict building heights near airports. At that time the height of any building within 5,000 feet of the boundary of an existing airport was limited to 20 feet, plus 5 feet for each 100 feet the building site was distant from the nearest boundary.[6]

On March 8, 1960, the County adopted a comprehensive amendment to the Cook County Zoning Ordinance for the purpose, among others, of promoting and protecting the public health, safety, morals, comfort, convenience and the general welfare of the people. Section 4.11—the

---

[5] Cook County Zoning Ordinance, § 8.3—5(2). Plaintiff's proposal requests a planned development in the R-6 classification.

[6] See Official Proceedings of the Board of Commissioners of Cook County, Illinois for the Fiscal Year 1939-1940, pp. 1922, 1925.

disputed height regulation—was included within the 1960 amendatory ordinance. Plaintiff asserts that, since it received FAA approval of the height of the proposed buildings, applying section 4.11 of the ordinance to prevent construction of the buildings would conflict with Federal regulations, and be invalid under section 5 of "An Act to empower counties to * * * construct * * * airports * * * " (Ill. Rev. Stat. 1973, ch. 15½, par. 73) and the supremacy clause in article VI of the United States Constitution.

Section 5 (Ill. Rev. Stat. 1973, ch. 15½, par. 73), relied upon by the plaintiff, is contained in that portion of our State statutes dealing with "Airports and Landing Fields."[7] As stated by the legislature in the enactment of this act, its purpose is "to empower counties to acquire, own, construct, manage, maintain, operate, and lease airports and landing fields, to levy taxes and issue bonds therefor, and to exercise the power of eminent domain." (Ill. Rev. Stat. 1973, ch. 15½, par. 69—83.) This act authorizes the counties to do just what the enabling language states. Amongst the various powers granted enabling the counties to carry out this authority section 5 (par. 73), cited by plaintiff, allows the counties to take a variety of actions to eliminate air hazards or remove interferences to airports. Section 5 (par. 73) allows the counties to "adopt, administer and enforce airport zoning regulations for and within the county * * *." The section then goes on and provides: "* * * and to make all reasonable rules and regulations for air traffic and airport or landing field conduct, and for the management and control of such an airport or landing field and other air navigation facilities and property under the county board's control. These rules and regulations shall not be in conflict with the laws of this State, or the laws or regulations of the United States, or the regulations of the Illinois Commerce Commission or the Department of Aeronautics of this State."

Plaintiff's reliance on section 5 (par. 73) is misplaced for the following reasons: (1) section 5 (par. 73) pertains to the counties acquiring or using property for an airport which is not involved in the instant case; (2) the State has adopted an "Airport Zoning Act" (ch. 15½, par. 48.1 et seq.) which has defined an airport hazard to include a structure such as a building and has given to the County the authority to adopt airport zoning regulations "[i]n order to prevent the * * * establishment of airport hazards * * *" (par. 48.13) including the authority to regulate the height of buildings (par. 48.15); and (3) the application of section 4.11 of the ordinance to the plaintiff's property does not con-

---

[7] Chapter 15½ of our Illinois statutes contains a number of acts dealing with the general subject of "aviation."

flict with the FAA regulation since it does not affect the regulation's application in this case.

Both the FAA regulation and the ordinance determine allowed building heights by the same glide ratio, *i.e.*, increasing the allowed height one foot every 50 feet distant from the base measuring line. An important difference between the regulation and the ordinance appears to be that the base measuring line for the FAA is the end of the runway and, for the ordinance, the boundaries of the airports. According to our computations from the glide ratio and other restrictions, the height allowed by the FAA increases from this line until it reaches 500 feet (25,000 feet distant) to which height buildings are restricted until 50,000 feet distant from the base measuring line. The ordinance allows 25 feet in height wherever the glide ratio measured from the boundaries would allow less than 25 feet. This would be up to 1,250 feet distant from the boundaries according to our calculations. Further calculations from the restrictions of the ordinance show the height allowed by Cook County increases on the basis of the glide ratio until it reaches 150 feet at 7,500 feet distant from the base measuring line. From 7,500 feet to two miles distant, no building can be more than 150 feet high.

Plaintiff challenges the validity of the ordinance in its adoption of a different base measuring line than that adopted in the federal regulation. We have not been directed to any evidence in the record demonstrating the difference between utilizing the two measures in the present case. In other words, it is impossible for this court and was presumably for the court below to compare the application of the two standards to the subject property. Various "estimates" appear in the record as to the distance between the Station boundary and the subject property ranging from 1,000 to 2,500 feet. The determining factor would be the distance between the base measuring line (the boundary or end of the runway) and the actual building sites. No attempts appear from the record to have been made to establish these distances.

Plaintiff cites *County of Cook v. Priester* (1st Dist. 1974), 22 Ill.App.3d 964, 318 N.E.2d 327,[8] in support of its contention. In *Priester* the county sought to enforce the provisions of a special use permit issued to the owners of the Pal-Waukee Airport, wherein the county imposed restrictions on the weight of aircraft as conditions on the county's granting of a special use permit allowing the extension of a runway. This court, in affirming the circuit court's finding that the weight restriction was void, held the restriction to be in contravention of both the Illinois Aeronautics

---

[8] This case is currently pending on appeal in the Illinois Supreme Court. Oral arguments are scheduled in November, 1975.

Act (Ill. Rev. Stat. 1973, ch. 15½, par. 22.25) and the Federal Aviation Program (49 U.S.C. § 1301 *et seq.*) which the *Priester* court refers to as the National Airport Plan. This court held that the Federal government had essentially preempted the field of air commerce which was affected by the county's weight restriction. Air commerce is not being controlled where the height of buildings within a certain distance from an airport is regulated by the county. What is instead being controlled is the construction of buildings. We do not think *Priester* supports the theory urged by plaintiff.

■■ The evidence in this record is clear that section 4.11 is a necessary and important part of the County's efforts to promote and protect the public health, safety, comfort and general welfare of persons nearby a designated airport. The evidence pertaining to potential flight hazards and the safety of the people living nearby as testified to by the Navy officers, in our opinion, illustrates the need for control in this field. Preemption is not at issue here because the goals of the Federal and local governments are different. The FAA is concerned with safe air traffic and has adopted regulations for the area at the end of runways—the approach zone. On the other hand, the County is concerned with the health, welfare and safety of people who live or work near an airfield. We hold the ordinance as applied to this property does not conflict with FAA regulations and does not violate the supremacy clause of article VI of the United States Constitution.

## II.

We next consider whether the ordinance, as plaintiff claims, is void for depriving plaintiff of the use of its property without just compensation and thus constitutes an unconstitutional taking. Plaintiff further contends the effect of the trial court's decision is to take plaintiff's property without just compensation. Defendant asserts the issue was waived by plaintiff's failure to assert it at trial and is therefore not properly before this court. Plaintiff generally alleged in its complaint that the ordinance, to the extent it prevented the proposed use, deprived the plaintiff of property without just compensation which defendants by answer denied.

Although raised by the pleadings, nothing in the record indicates that this issue was thereafter pursued by the plaintiff in the trial court. Nor does the record demonstrate the trial court decided this issue. Ample authority exists to support defendants' contention that reviewing courts need not consider issues or theories that are raised for the first time on appeal. However, we shall consider the question on the basis that there was reference in the pleadings to the subject.

The question is whether the height limitation in the ordinance is authorized by the police power of the County or whether in reality it created an air easement over plaintiff's property without the payment of compensation.

As to the merits of this claim, plaintiff cites several cases, referred to later in this opinion, from other jurisdictions holding height restrictions in airport approaches imposed by governmental bodies to be "takings" within the meaning of the fifth amendment to the United States Constitution. Defendant cites several other cases which, it suggests, hold similar restrictions to be valid exercises of the police power and thus not compensable.[9] In addition, both parties discuss the effect of *Griggs v. Allegheny County* (1962), 369 U.S. 84, 7 L.Ed.2d 585, 82 S.Ct. 531, and *United States v. Causby* (1946), 328 U.S. 256, 90 L.Ed. 1206, 66 S.Ct. 1062, on the issue. In both of these cases, frequent overflights of the respective plaintiffs' properties were deemed to so drastically deprive the plaintiffs of the beneficial use of their properties that an easement was created in those operating the respective airports—both governmental bodies. The creation of these easements was held to have "taken" plaintiffs' properties without just compensation.

Neither *Griggs* nor *Causby* assist directly in determining whether zoning ordinances promulgated pursuant to statutory authority can "take" in the same manner. It is relevant that, in *Causby*, the Court found important the fact that the airplanes there involved were flying below the minimum altitude required by the Civil Aeronautics Administration. (328 U.S. 256, 263-64, 90 L.Ed. 1206, 1211-12.) In *Griggs*, the Court held the regulator—the Federal government—took nothing by its regulations establishing navigable airspace. (369 U.S. 84, 89, 7 L.Ed.2d 585, 588.)[10] In *Causby*, the Court noted:

> "The airplane is part of the modern environment of life, and the inconveniences which it causes are normally not compensable under the Fifth Amendment. The airspace, apart from the immediate reaches above the land, is part of the public domain. We need

---

[9] Defendant cites to *Village of Willoughby Hills v. Corrigan* (1972), 29 Ohio St. 2d 39, 278 N.E.2d 658, *cert. denied, Chongris v. Corrigan,* 409 U.S. 919, 34 L.Ed.2d 181, 93 S.Ct. 218; *Harrell's Candy Kitchen, Inc. v. Sarasota-Manatee Airport Authority* (Fla. 1959), 111 So.2d 439; *Waring v. Peterson* (Fla.App. 1962), 137 So.2d 268; *Baggett v. City of Montgomery* (1963), 276 Ala. 166, 160 So.2d 6; *Smith v. County of Santa Barbara* (1966), 243 Cal.App.2d 126, 52 Cal. Rptr. 292; *Township of Hickory v. Chadderton* (Pa. C.P. 1967), 43 Pa.D.&C.2d 319; *Morse v. San Luis Obispo County* (1967), 247 Cal.App.2d 600, 55 Cal. Rptr. 710.

[10] Justices Black and Frankfurter believed the Federal government through its regulations and not Allegheny County as the owner of the airport was the "taker." 369 U.S. 84, 91, 94, 7 L.Ed.2d 585, 590, 591-92.

not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." (*Causby*, 328 U.S. 256, 266, 90 L.Ed. 1206, 1213.)

Thus, interpreting overflights as "takings" within the meaning of the fifth amendment would seem to be more the exception than the rule.

■■ Several courts in other jurisdictions have, as plaintiff points out, held ordinances restricting height near airports to be "takings" rather than regulations based in the police power. (*Peacock v. County of Sacramento* (3rd Dist. 1969), 271 Cal.App.2d 845, 77 Cal. Rptr. 391; *Yara Engineering Corp. v. City of Newark* (1945), 132 N.J.L. 370, 40 A.2d 559; *Indiana Toll Road Com. v. Jankovich* (1963), 244 Ind. 574, 193 N.E.2d 237; *Roark v. City of Caldwell* (1964), 87 Idaho 557, 394 P.2d 641.) Another case cited by the plaintiff, *Ackerman v. Port of Seattle* (1960), 55 Wash.2d 400, 348 P.2d 664, actually involved low overflights as in *Griggs* and *Causby* rather than restrictive zoning ordinances. The rationale of those cases holding height restriction ordinances to be "takings" was, however, well stated by the *Ackerman* court and has been frequently cited for that purpose. That court essentially held that where governmental regulation actually destroys private property for public purposes, police power rules are usually applicable and such action is not compensable, whereas if the regulation appropriates private property for public *use*, the government must resort to its eminent domain powers and compensate the private owners for their loss. 55 Wash. 400, 408.

■■ It was long ago held in this State that the power to regulate the height of a structure where it is reasonably necessary for the protection of the public health, safety or welfare is in exercise of the police power, and that all private property is held subject to a reasonable exercise of that power. (See *Federal Electric Co. v. Zoning Board of Appeals* (1947), 398 Ill. 142, 147, 75 N.E.2d 359.) In fact various use, lot and bulk regulations in zoning ordinances restrict a property owner in the full, complete and unrestricted use of private property. These restrictions are imposed to promote the public health, safety, morals, comfort and general welfare of the people.

■■ We do not believe that height restriction ordinances such as the one presently at issue do, in fact, appropriate private property for public use. The purpose of such ordinances is to protect the public from air hazards. We believe that in this day when airplane traffic is increasing, the need to protect the public from air hazards is a proper exercise of police power. Whether or not the Federal government, in its operation of Glenview Naval Air Station is "taking" the private property of

owners in the surrounding areas by their overflights is not the case before this court. In our opinion the present ordinance was created for a valid purpose well within the police power of the County and it was not the purpose and has not been the effect of the *ordinance* to take private land and appropriate it to public use.

## III.

■■ The third issue for our resolution is whether the height restriction ordinance, as applied to the plaintiff, violates due process of law. In making such a challenge, a plaintiff has a dual burden of proof. First the plaintiff has a burden of showing by clear and convincing evidence that the ordinance as applied to it is arbitrary, discriminatory and not reasonably related to public health, safety, morals or general welfare. (*La Salle National Bank v. County of Cook* (1957), 12 Ill.2d 40, 46, 145 N.E.2d 65; *Galt v. County of Cook* (1950), 405 Ill. 396, 403-04, 91 N.E.2d 395.) Once the plaintiff meets this burden, an additional burden is imposed—showing by a preponderance of the evidence that the use which is proposed is reasonable. *Mangel & Co. v. Village of Wilmette* (1st Dist. 1969), 115 Ill.App.2d 383, 391, 253 N.E.2d 9.

Plaintiff launches several attacks against the height restriction ordinance as arbitrary, unreasonable and unrelated to public health, safety, morals and the general welfare. It charges that under the ordinance a structure 25 feet in height would be permitted at the Station boundary, whereas under FAA regulations, beginning its glide ratio at the ends of the runway, no such structure would be allowed. Plaintiff's property is not located at the Station boundary but at some unknown distance from the eastern boundary of the Station. Consequently, as we have stated elsewhere in this opinion, since it has not been shown that the regulations of FAA and this provision of the ordinance restrict plaintiff's property differently, no conflict between the ordinance and the FAA regulations has been proved in the present case. Plaintiff's contention of arbitrariness on this ground thus has no foundation.

Plaintiff argues arbitrariness in that the ordinance, by using boundaries as base measuring lines, does not, as does the Federal regulation which uses the end of the runways, limit its height restrictions to the approach zones. Plaintiff apparently believes the ordinance could relate to the public health, safety, morals and general welfare only if the restrictions are connected to these zones. Plaintiff's only witness in this regard, Frank Lappas, admitted his extremely limited knowledge of the day-to-day activities at the Station, and that he was only aware of one missed approach zone near the subject property. He also admitted he

had no experience as either a pilot or an air traffic controller. Defendant elicited testimony from the Commanding Officer and Air Traffic Control Facility Officer at the Station emphasizing the dangers involved in emergency situations, that such dangers are not adequately protected against by the Federal regulation, that missed approach zones definitely lie over the subject property, and that the ordinance assists in protecting against the dangers of such situations to the extent not covered by the regulation. In light of this testimony, we think the court was justified in finding plaintiff had failed to show the ordinance is arbitrary, unreasonable or unrelated to public health, safety, morals and general welfare in the choice of base measuring line to be utilized.

On the same grounds, plaintiff attacks the failure to contemplate potential variations in land elevation in the ordinance's calculation of allowed heights. It alleged portions of the subject property were lower in elevation than the land upon which the Station is built. Although plaintiff presented a "Site Development Plan" illustrating the location of the buildings, open areas, recreational facilities and driveways, we do not find sufficient meaningful evidence in the record to explain and support plaintiff's argument. Plaintiff failed to sustain its burden to prove by clear and convincing evidence that these alleged variations in land elevation invalidated section 4.11.

Finally, plaintiff correctly points to the recent preemption by the Federal government of the field of aircraft noise control. (*City of Burbank v. Lockheed Air Terminal, Inc.* (1973), 411 U.S. 624, 36 L.Ed.2d 547, 93 S.Ct. 1854; *Village of Bensenville v. City of Chicago* (1st Dist. 1973), 16 Ill.App.3d 733, 738, 306 N.E.2d 562.) While the evidence taken as to noise problems residents of the proposed development would encounter and fears Navy personnel had about complaints resulting from such encounters, may have been taken into account by the trial judge, other competent evidence clearly supports the finding of the trial court. *McFail v. Braden* (1960), 19 Ill.2d 108, 120-21, 166 N.E.2d 46.

## IV.

Lastly we consider the question of whether plaintiff's failure to argue on appeal the unconstitutionality of the present zoning classification of the subject property precludes this court from reviewing the merits of that claim. Plaintiff's original brief did not raise or argue the point that the M-1 zoning classification as applied to its property is invalid, or that its evidence proved the invalidity. Defendants' brief pointed this out and asserted that plaintiff thereby waived this point. In its reply brief, plaintiff contends that all three points in its main brief "deal with the constitutional invalidity of the existing zoning, which is M-1, as applied to

Plaintiff's property." Thereafter, it attempts to support this statement by alleging that, because of the soil conditions, the potentiality for building in accordance with the present zoning classification is economically unfeasible. Since the only use which plaintiff considers economically feasible would involve a change of zoning classification, it seems to believe its arguments attacking the height restriction in the ordinance raised the issue of the validity of the M-1 classification. Of course the height restriction in section 4.11 applies to all of the zoning districts under the ordinance.

The pleadings submitted and evidence presented in the trial court, by both parties, to a great extent followed the traditional approach of cases involving an attack on, and the defense of, a zoning classification as applied to plaintiff's property. In addition to evidence regarding the height of buildings near airports, plaintiff presented evidence concerning planning and real estate valuations, traffic, soil conditions and nearby school facilities. Likewise defendant countered with evidence as to each of the aforesaid subjects as well as the subject of noise pollution. The trial court's judgment was that the ordinance " * * * as applied to the subject property * * * is valid and constitutional in all respects and bears a real and substantial relation to the public health, safety, morals, comfort, convenience, and general welfare of the people." By failing to urge on appeal the error of the trial court in affirming the present zoning classification, the plaintiff has waived this point on appeal. Plaintiff's appeal challenged the invalidity of section 4.11, but it failed to point out how it sustained its burden of proof regarding the invalidity of the present M-1 zoning classification. *Cf. Galt v. County of Cook* (1950), 405 Ill. 396, 404, 91 N.E.2d 395.

Points not argued are waived and shall not be raised in the reply brief or oral argument. Supreme Court Rule 341(e)(7) (Ill. Rev. Stat. 1973, ch. 110A, par. 341(e)(7)).

■■ This court stated in *Werdell v. Turzynski* (1st Dist. 1970), 128 Ill.App.2d 139, 147-48, 262 N.E.2d 833, that an issue raised in a brief but not argued on appeal is waived. (See also *Wright v. McGee* (1st Dist. 1970), 131 Ill.App.2d 522, 526, 264 N.E.2d 882; *Pipitone v. Mandala* (2nd Dist. 1962), 33 Ill.App.2d 461, 467, 180 N.E.2d 33.) In our opinion plaintiff has waived any argument as to the validity of the present M-1 zoning classification.

We have also reviewed the record to determine whether plaintiff would have prevailed had it properly preserved the issue on appeal. From our review of the record we are satisfied, for the following reasons, the trial court was correct in upholding the validity of the ordinance as applied to plaintiff's property.

In zoning cases it is elementary that each zoning ordinance is wrapped in a cloak of presumptive validity, and one assailing the validity of such an ordinance must prove by clear and convincing evidence that the ordinance is arbitrary, capricious and unreasonable, and if there is room for a legitimate difference of opinion concerning the reasonableness of the ordinance, the courts will not interfere with the legislative judgment. *First National Bank v. County of Lake* (1955), 7 Ill.2d 213, 225-26, 130 N.E.2d 267; *La Salle National Bank v. Village of Western Springs* (1st Dist. 1974), 22 Ill.App.3d 533, 539-40, 317 N.E.2d 646.

The burdens imposed for proving the invalidity of the height restriction in the zoning ordinance apply equally to proving the invalidity of the zoning classification of the subject property. *La Salle National Bank v. City of Evanston* (1974), 57 Ill.2d 415, 428, 312 N.E.2d 625; *People v. Wright* (1974), 57 Ill.2d 166, 168, 311 N.E.2d 153; *Mangel & Co. v. Village of Wilmette* (1st Dist. 1969), 115 Ill.App.2d 383, 391, 253 N.E.2d 9.

■■ Our review of the entire record convinces us that plaintiff failed to overcome the presumptive validity of the present zoning classification. The record is clear that methane gas will generally exist when buried garbage decomposes in an uncontrolled landfill and that the gas can be fatal in enclosed areas and is especially dangerous since odorless. The impact of 1,533 residential units, amounting to 17 units per acre on the subject site with the problems of methane gas and soil compaction, in our opinion, would create a hazard to the safety, health and general welfare of the residents on the property, clearly justifying the denial of plaintiff's effort to reclassify the property. Coupled with this hazardous condition is the impact the proposal would have on traffic and schools. (See *Forestview Homeowners Association, Inc. v. County of Cook* (1st Dist. 1974), 18 Ill.App.3d 230, 245-46, 309 N.E.2d 763.) Furthermore we would note that even plaintiff's witness admitted that the property could be successfully developed for industrial purposes under the present zoning.

The facts here were clearly established that property owners who had taken soil from their land for their own economic benefit, and who then refilled the excavations with garbage and other materials for their own economic benefit, thereby created a condition on the land which will require serious planning, attention and conscientious effort before it can be safely used.

As we said in *Forestview* (18 Ill.App.3d 230, 247), "[a] change in zoning cannot be justified by the desires of certain individuals; it is justified only because the public welfare requires it."

282

Therefore, for the foregoing reasons the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

STAMOS and LEIGHTON, JJ., concur.