TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-98-00455-CV







City of Austin/Travis County Landfill Company, L.L.C., Appellants




v.




Travis County Landfill Company, L.L.C./City of Austin, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT


NO. 97-07362, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING







 This case involves the City of Austin's operation of the Austin-Bergstrom
International Airport ("the airport"). A jury found the City of Austin ("City") liable to the Travis
County Landfill Company, L.L.C. ("TCLC") for taking, by overflights, the airspace over
TCLC's property, which is located approximately one-half mile south of one of the airport's two
runways. The jury also found that, as a result, TCLC suffered $2,950,000 in damages. The City
appeals the trial court judgment rendered in favor of TCLC; TCLC appeals the trial court's denial
of its request for a permanent injunction and attorney's fees. We will affirm the trial court's
judgment.


BACKGROUND


 The City owns and operates the airport, which is located in southeast Travis County
on a site formerly occupied by Bergstrom Air Force Base ("Bergstrom"). (1) The airport came to
be located on this site after the City's voters approved a May 1993 referendum to build a new
municipal airport there. The City officially took ownership of the Bergstrom property during a
September 1993 ceremony.

 TCLC owns a 135-acre tract of land located approximately one-half mile south of
airport runway 35L. This land is burdened by a "Perpetual Overflight Easement for Military
Aircraft" (the "Easement") granted by TCLC's predecessors in title to the United States and its
assigns. The Easement gives the grantee the right to prohibit or remove any obstacles from
intruding into a certain amount of airspace above the subject property. The Easement also
conveys "the right of unobstructed passage of all military aircraft and aircraft operated under
military control . . . in all air space above the surface of the Grantors' property . . . ." (2) 
(Emphasis added.) The City informed the federal government that it planned to operate the
Bergstrom property as a municipal airport subject to federal regulation, and thus needed a number
of easements acquired by the Air Force during its operation of Bergstrom. The federal
government therefore assigned the Easement burdening TCLC's land to the City. According to
Mike Mays, TCLC's manager, (3) the City asked TCLC to expand the Easement to permit
overflights for all aircraft, rather than just military aircraft. Mays testified that TCLC refused the
request because overflight rights are "a valuable asset" and TCLC did not feel that it "should have
to donate [the rights] to the City." The City did not obtain or purchase an easement for civilian
flights over TCLC's land.

 The airport began commercial air cargo operations around June 30, 1997. TCLC
sued the City, alleging that the City's operating and flying civilian operations through airspace
over TCLC's land without permission constituted a taking of its property. See Tex. Const. art.
I, § 17 ("No person's property shall be taken, damaged or destroyed for . . . public use without
adequate compensation being made."). TCLC requested the court to declare that the scope of the
Easement did not include avigation rights for municipal airport purposes, and sought an injunction
prohibiting the City from authorizing or directing overflights of the subject property until the City
obtained legal overflight rights through condemnation proceedings or through purchase of an
easement. (4) TCLC also sought actual and exemplary damages for trespass and inverse
condemnation, as well as attorney's fees.

 By the time the parties presented their case to the jury, the airport had flown over
six thousand non-military flights through the airspace above TCLC's property. The City's
position throughout trial was that TCLC had no right to the airspace above its land; therefore,
civilian overflights did not take or cause any harm to TCLC's property. The City argued below
and argues now on appeal that TCLC's property instead was harmed by height restrictions already
imposed on the property by federal aviation law, the Easement, and the City's Hazard Zoning
Ordinance. The City reasons that because these height restrictions burdened TCLC's land before
the airport began flying air cargo operations over the land, the City took nothing from TCLC
when civilian operations commenced.

 The City's theory that TCLC's property is limited by height restrictions, rather than
overflights, is based on the use to which TCLC intends to put the subject property. The trial
evidence established that TCLC owns a permit to operate a Type IV landfill on its property. This 
permit allows dry waste to be deposited in the landfill, such as construction and remodeling
rubble, tree clippings, and tires.

 We begin with a short history of the development of the landfill project. An
enterprise named 244 Joint Venture purchased the subject property in 1983. Because the subject
property is adjacent to the City's Type I landfill, (5) the members of 244 Joint Venture believed it 
could also be developed as a landfill. Therefore, they formed a partnership called the Travis
County Landfill Company (the "Company") to obtain a permit to operate a Type IV landfill (6) on
the property. The Company obtained the permit in 1988. Because of a lull in building projects
in the late 1980s, the Company determined that there was an insufficient stream of construction
waste to justify the expense of opening a Type IV landfill at that time.

 In 1992, the Company changed its business structure to become TCLC, the limited
liability company that is a party to this case. The Federal Deposit Insurance Corporation closed
the bank holding 244 Joint Venture's note and requested full payment of the note. TCLC paid the
outstanding amount of the bank loan in December 1993, thus bringing under its ownership both
an interest in the subject property and the landfill permit.

 The appraisal experts for the City and TCLC both testified that, excluding the
existence of the airport, the highest and best use of TCLC's land was a Type IV landfill vertically
expanded beyond the existing permit. TCLC also presented the testimony of a professional
engineer who stated that but for the airport it was "extremely likely" that the Texas Natural
Resource Conservation Commission ("TNRCC") would grant a vertical expansion of the existing
permit.

 Both parties' appraisal experts explained that valuing the subject property as if the
airport did not exist is the first step in determining the damages resulting from an alleged taking
by a federally funded project, such as the airport. After determining the fair market value of the
whole property, excluding from consideration the construction and operations of the airport, the
appraisers determined the fair market value of the property immediately after the taking,
considering the uses to which the remainder will be subjected. Both parties' appraisal experts
agreed that, excluding the existence of the airport, the highest and best use of TCLC's land was
a vertically expanded Type IV landfill. Furthermore, both parties' experts testified that, excluding
from consideration the construction and operations of the airport, the fair market value of TCLC's
property was $9,800,000. Both experts also expressed the opinion that the fair market value of
the property decreased with the airport in operation. Two reasons identified by the experts for the
decrease in value were: (1) TCLC's inability to vertically expand its landfill beyond the existing
permit; and (2) the increased risk associated with operating a landfill adjacent to a municipal
airport. The experts differed as to the effect of the increased risk. The City's expert testified that
the remainder of TCLC's land, considering the airport operations, was worth $7,500,000, while
TCLC's expert determined the remainder to be worth $6,200,000.

 The trial court submitted both a liability and a damage question to the jury. The
jury determined that the City took TCLC's airspace rights by overflights associated with the
operation of the airport and determined the fair market value of the land after the taking to be
$6,850,000, a sum between the two valuations presented by the experts.

 The City moved for judgment notwithstanding the verdict, but the trial court denied
the motion. (7) The trial court rendered judgment for TCLC and awarded it $2,950,000 in damages,
the difference found by the jury in the property's value before and after the taking. The court
denied TCLC's request for injunctive relief and attorney's fees. TCLC asked the court to make
findings of fact and conclusions of law in support of the final judgment. The trial court concluded
as a matter of law that, "[b]eginning on or about June 30, 1997, TCLC's superadjacent [sic]
airspace rights were taken by regular and frequent overflights conducted in connection with the
operation of [the airport]." The City appeals the trial court judgment in six issues, arguing in the
first five issues that the trial court erred by denying the grounds stated in its motion for judgment
notwithstanding the verdict, and arguing in its sixth issue that the trial court erred in its charge to
the jury. TCLC also appeals the trial court judgment. In two issues, TCLC contends that the trial
court abused its discretion by failing to enjoin overflights by the airport pending the City's
payment of compensation and by failing to award TCLC attorney's fees.


DISCUSSION

 The City has consistently characterized TCLC's claim as a complaint that the height
restrictions burdening its property prohibit it from expanding a landfill as high as it wishes. 
TCLC, on the other hand, alleged and proved to the jury's satisfaction that the City took its
property by overflights; in other words, TCLC's complaint is based on the physical intrusion of
aircraft into the airspace over its land. The City's desire to focus on the height restrictions
burdening TCLC's property does not change the nature of the case pleaded and proved by TCLC. 
Therefore, we must determine whether the City's issues prove reversible error in the takings case
presented to the jury.


I. City's Appeal

Height Restrictions on TCLC's Land

 At common law, "ownership of the land extended to the periphery of the universe."
United States v. Causby, 328 U.S. 256, 260 (1946). Modern law, however, gives "exclusive
sovereignty of airspace of the United States" to the federal government, and gives United States
citizens "a public right of transit through navigable airspace." 49 U.S.C.A. § 40103(a)(1), (2)
(West 1997). "Navigable airspace" means "airspace above the minimum altitudes of flight"
prescribed by federal regulations, "including airspace needed to ensure safety in the takeoff and
landing of aircraft." Id. § 40102(a)(30); see also 14 C.F.R. § 1.1 (1999). The Federal Aviation
Administration ("FAA") has established the minimum altitude of flight as heights of 500 feet
above ground level for uncongested areas and 1000 feet for congested areas. 14 C.F.R. § 91.119
(1999).

 Much of the airspace over TCLC's land, including the airspace under 500 feet, is
navigable airspace because it is needed to ensure safety in the takeoff and landing of aircraft
utilizing the south end of airport runway 35L. Trial testimony established that pilots are required
to follow a "glide slope" when they are landing aircrafts using their instruments, as opposed to
their sight. (8) See Persyn v. United States, 34 Fed. Cl. 187, 198 (1995), aff'd, 106 F.3d 424 (Fed.
Cir. 1996) (defining the term "glide slope"). The glide slope for runway 35L, established by the
FAA, begins at 495 feet over the south end of TCLC's property and slopes down to 223 feet over
the north end of the property, which is the area of the property closest to the runway. The FAA
has also defined a number of "imaginary surfaces" for civil airports. See 14 C.F.R. § 77.25
(1999). One such surface is the "approach surface." See id. The approach surface for runway
35L begins at approximately 100 feet over the south end of TCLC's land and slopes down to
approximately 35 feet above the north end of the land. The Easement, discussed above, permits
the City to keep the approach surface over TCLC's land free of any obstacles. Thus, the
imaginary surface acts as a ceiling over the land, and the Easement prohibits obstructions from
extending above that ceiling.

 TCLC's land is thus burdened by federal regulations defining the land's superjacent
airspace as navigable airspace. The City claims in its first issue that TCLC suffered no harm
when the airport began operations in 1997 because federal law has restricted the airspace over the
subject property since 1958, when Congress first defined "navigable airspace" to include airspace
needed for safe takeoff and landing. The City makes similar claims in its third and fifth issues
by arguing that a previous owner of the subject property was compensated for the height
restrictions now burdening TCLC's land when the previous owner sold the Easement to the federal
government in 1982, and that an Ordinance passed by the City, which prohibits the building of any
structure or object into federal navigable airspace, is a legitimate exercise of the City's police
power.

 In 1962, the United States Supreme Court held that frequent low level flights over
a person's property may constitute a taking, regardless of whether the airspace above the
landowner's property constitutes federal navigable airspace. See Griggs v. County of Allegheny,
369 U.S. 84, 88-90 (1962). In Griggs, the approach area for one of the runways passed over the
landowner's home; flights taking off passed from 30 feet to 300 feet over the residence, while
flights landing traveled from 53 feet to 153 feet over the home. See id. at 87. The Court relied
on United States v. Causby, 328 U.S. 256 (1945) to hold that flights through navigable airspace
can constitute a compensable taking.

 In Causby, the Court noted that airspace is a "public highway"; however,



[I]t is obvious that if the landowner is to have full enjoyment of the land, he must
have exclusive control of the immediate reaches of the enveloping atmosphere. 
Otherwise, buildings could not be erected, trees could not be planted, and even
fences could not be run. . . . The superadjacent [sic] airspace at this low altitude
is so close to the land that continuous invasions of it affect the use of the surface
of the land itself. We think that the landowner, as an incident to his ownership, has
a claim to it and that invasions of it are in the same category as invasions of the
surface.



328 U.S. at 265. The Court concluded that "the flight of airplanes, which skim the surface but
do not touch it, is as much an appropriation of the use of the land as a more conventional entry
upon it." Id. at 264. Thus, according to Causby, Griggs, and their progeny, a compensable
taking by overflight may occur when frequent and low flights by aircraft cause direct, immediate,
and substantial interference w ith the property owner's use and enjoyment of the land. See Griggs,
369 U.S. at 89-90; Causby, 328 U.S. at 266; Brown v. United States, 73 F.3d 1100, 1102 (Fed.
Cir. 1996).

 Texas cases have cited Griggs to find that low overflights may result in the taking
of an air easement. In City of Houston v. McFadden, 420 S.W.2d 811 (Tex. Civ. App.--Houston
[14th Dist.] 1967, writ ref'd n.r.e.), McFadden sued the City of Houston for taking his property
as a result of the City's operation of Houston International Airport. The City constructed a new,
longer runway for jet propelled aircraft after McFadden purchased his property and built a home
near the airport. The jet airplanes flew at low altitudes over McFadden's home when taking off
and landing, causing physical damage to McFadden's home. The court of appeals, citing Griggs,
noted, "This type of action has been recognized and approved as a 'taking' of property, in the
constitutional sense, in the nature of an air easement for which compensation must be made." 
McFadden, 420 S.W.2d at 814; see also Sjolander v. City of Houston, 551 S.W.2d 166, 168 (Tex.
Civ. App.--Houston 1977, no writ). More recently, the Texas Supreme Court has noted that this
cause of action exists. See Felts v. Harris County, 915 S.W.2d 482, 486 (Tex. 1996)
(distinguishing highway traffic noise case from "cases involving airplane overhead flights . . .
[which] involve the 'taking' of air easements . . . .") (citing McFadden, 420 S.W.2d at 814).

 The City's argument that federal height restrictions have long burdened TCLC's
land thus does not foreclose TCLC's claim that the City has taken its property by physically
intruding into the airspace immediately above its land. We believe this conclusion is supported
not only by case law but also by the federal agency imposing the height restrictions on the land. 
FAA Advisory Circular 150/5100-17 (the "FAA Advisory Circular") describes avigation
easements and explains that such an easement may be used to "secure airspace for airport and
runway approach protection." United States Department of Transportation, Federal Aviation
Administration, Land Acquisition and Relocation Assistance for Airport Improvement Program
Assisted Projects, Advisory Circular 150/5100-17 ¶ 2-7(a) (March 29, 1996). (9) Paragraph 2-7(b)
explains that "Avigation easements are typically acquired for airspace requirements . . . including
the approach area." Id. ¶ 2-7(b). This FAA Advisory Circular supports our holding that, even
though the airspace immediately over one's land may be federal navigable airspace because it is
needed for safe takeoffs and landings, flights through such space may still constitute a taking for
which compensation is due. The City's first issue is overruled.

 The City alternatively claims that a previous owner was compensated for the height
restrictions imposed by the Easement over TCLC's land. This argument also attempts to
pigeonhole TCLC's overflights claim into a "taking by height restrictions" claim. We have
explained above that federal and state case law permit a landowner to pursue a takings claim based
on aircraft flying at low levels over its land. That is the claim TCLC alleged in its original
petition and the claim before us in this appeal. We will therefore review whether TCLC's
overflight complaint is barred by the Easement burdening its property.

 The Easement begins by describing the federal "imaginary surfaces" over the
subject property, specifically, the approach surface and the transition surface. It describes the
manner in which these surfaces slope upward and lists specifically the height of the imaginary
surfaces over different parts of the subject property. The Easement then grants the following
rights on and above the described land: (1) the right "to trim or remove" those portions of trees,
bushes, shrubs, or any other perennial growth "infringing upon or extending into or above the
approach zone plane and the transitional zone as described above"; (2) the same right for any
growth "which could in the future" extend into the described surfaces; (3) the right to "remove,
raze, or destroy" portions of buildings, other structures, or land extending into the described
surfaces; (4) the right to "prohibit the future construction of buildings or other structures" from
extending into the described surfaces; and (5) the right of "ingress and egress over said land to
effect and maintain the necessary clearance." These five rights are referred to as an "obstruction"
easement or a "clearance" easement. As we explained above, the Easement also provides military
aircraft the right of unobstructed passage in all airspace above the surface of the subject property. 
This right is referred to as an "avigation" easement. 

 The City argues that the trial court failed to specify whether the City had taken an
obstruction easement or an avigation easement. The trial court concluded, however, that "TCLC's
superadjacent [sic] airspace rights were taken by regular and frequent overflights . . . ."
(Emphasis added.) Thus, in the event that such a specific finding is necessary, the trial court
clearly specified that the City took an avigation easement by virtue of civilian overflights. The
City contends, however, that it is the height restrictions imposed by the obstruction easement that
prevent TCLC from vertically expanding its landfill; therefore, the trial court erred by permitting
TCLC to maintain a takings claim on its theory that the avigation easement does not include the
right to fly civilian operations over its land. We disagree. TCLC's takings claim is based on
overflights. The City's obstruction easement does not give it overflight rights, and the avigation
easement provides only military aircraft the right of unobstructed passage in the airspace above
TCLC's land. See Kearney & Son v. Fancher, 401 S.W.2d 897, 905 (Tex. Civ. App.--Fort
Worth 1966, writ ref'd n.r.e.) (limited easement restricted to stated purpose); see also Jefferson
County v. Farris, 476 S.W.2d 457 (Tex. Civ. App.--Beaumont 1972, orig. proceeding)
(explaining that obstruction easement and avigation easement are separate and independent of one
another). The FAA Circular discussed above acknowledges that an airport operator may need to
acquire both an avigation easement and an obstruction easement. See FAA Circular no. 150/5100-17 ("Where right of flight is required, lesser rights, such as clearance easements, are not sufficient
to protect an airport owner from future claims of property owners due to over flights."). The
City's third issue is overruled.

 The City contends in issue five that its Ordinance restricting the airspace around
the airport is a valid exercise of its police power and thus cannot constitute a taking as a matter
of law. Pursuant to the Texas Local Government Code, the City has the right to adopt,
administer, and enforce extraterritorial airport zoning. (10) The Ordinance at issue creates zones
around the airport identical to the federal imaginary surfaces established by the FAA, and limits
the height of structures and trees in these zones. See City of Austin Ordinance No. 940421-J.

 With this issue, the City once again attempts to confine TCLC's takings claim to
the height restrictions burdening its property. We have already stated that TCLC's complaint is
based on repeated civilian overflights for which the City obtained no easement. The City's
Ordinance, which imposes identical height restrictions on TCLC's land as the Easement and the
federal imaginary surfaces, does not give the City the right to direct civilian flights at low levels
over TCLC's land. The Local Government Code gives the City authority to obtain an air
easement over TCLC's land if "airport zoning regulations are not sufficient to provide necessary
approach protection because of constitutional limitations." Tex. Loc. Gov't Code Ann. § 241.903
(West 1999). The City simply failed to obtain an air easement in this case. Issue five is
overruled.

 We have overruled the City's contentions that the height restrictions burdening
TCLC's property bar its takings claim. The City has urged in issues one and three, however, the
slightly different argument that overflights have not decreased the fair market value of TCLC's
land. In its reply brief, the City argues that the manner in which the property was appraised for
trial was improper. In essence, these complaints attack the damages awarded to TCLC. The City
did not object to the type of evidence presented by TCLC's real estate appraiser, did not object
to the court's charge on the fair market value of the remainder, and has not raised an independent
issue regarding damages on appeal. However, because the City argued in its motion for judgment
notwithstanding the verdict that overflights did not decrease the fair market value of TCLC's land
and raises several arguments regarding whether overflights have decreased the fair market value
of the land, we will address the damages question in the interest of completeness.

 The City argues that the overflights have not caused TCLC the type of harm
suffered by the plaintiffs in Causby, Griggs, and McFadden. In those cases, the landowners'
homes were damaged and their sleep was interrupted, and the noise and proximity of the aircraft
flying overhead rendered their homes virtually uninhabitable. In the instant case, TCLC has
alleged that the overflights decreased the fair market value of its undeveloped property, which is
permitted for a Type IV landfill. It has not claimed that the noise or vibrations from overflights
have harmed the underlying property in any way.

 Despite the difference between this case and earlier overflight cases, we hold that
the trial court did not err in awarding TCLC damages on the facts before us in this case. Both the
City and TCLC presented appraisers who testified that airport operations caused a decrease in the
fair market value of TCLC's land for two reasons: TCLC's inability to vertically expand its
landfill on one hand, but also the increased risk associated with operating a landfill in close
proximity to a municipal airport.

 In partial taking cases, damages are measured by the "difference between (a) the
value of the landowner's entire tract before the taking, and (b) the market value of the remainder
after the taking, giving consideration to the uses to which the condemned part is to be subjected." 
Westgate, Ltd. v. State, 843 S.W.2d 448, 457 (Tex. 1992). To determine the fair market value
of the land before the taking, the fact that the land will be taken must not be considered. See City
of Fort Worth v. Corbin, 504 S.W.2d 828, 830 (Tex. 1974) ("The fact of condemnation itself is
excluded; fair market value must, by definition, be computed as if there were no proceedings to
eliminate that market."). The court in Corbin noted that this method involves a "hypothetical
exercise." Id. at 830.

 Holland Young, the Planning and Development Manager for the City's airport
department, testified that under FAA guidelines the City was required to exclude consideration
of the airport in valuing the property before the taking. Isabella Lauraine Rizer, the Chief
Appraiser for the City's Real Estate Division, also testified that the City was required to adhere
to federal guidelines for acquiring property for the airport, a federally funded project, and that one
of those guidelines required the City to exclude from consideration the influence the project would
have on the value of the land being taken. (11) She was asked, "And if it's an airport that['s] going
to have -- cause overflights that's going to damage the value of the property, you don't take that
into account, do you?" Rizer responded, "No." The independent appraiser called by the City,
David Bolton, also testified that, when determining the value of the subject property before the
taking, the project charged with taking the property should be excluded from consideration.

 We have explained earlier that both Bolton and TCLC's expert, Clint Sayers,
testified that, excluding the existence of the airport and its operations, TCLC's property had a fair
market value of $9,800,000. Both experts also testified that, immediately after the taking, the fair
market value of TCLC's property decreased. Bolton, the City's expert, testified that the decrease
was due to TCLC's inability to vertically expand its landfill and an increased risk factor resulting
from possible environmental and technological changes, as well as higher insurance. Sayers's
testimony was similar, but his valuation of the property included an even higher risk factor than
Bolton's. Sayers cited as reasons for the increased risks such things as possible changes in FAA
regulations, and the manner in which the landfill operator would have to oversee the landfill in
light of its proximity to a municipal airport. Bolton valued the remainder at $7,500,000; Sayers
valued the remainder at $6,200,000; the jury valued the remainder at $6,850,000.

 At trial, the City's appraiser agreed that the project influence rule was to be
followed in appraising TCLC's property, and he presented evidence that the fair market value of
TCLC's land decreased when the City began operating the airport. Therefore, the City cannot
argue that airport operations did not decrease the fair market value of TCLC's land, or that
TCLC's evidence of the market value of its land before the taking, which excludes from
consideration the existence of the airport, and its evidence of the value of the remainder,
considering the use to which the land can be put with the airport in existence, is the wrong way
to estimate damages in this case. It is the very evidence the City itself presented.

 We note finally that even without the height restrictions burdening TCLC's
property, frequent low level overflights would prevent TCLC from stacking its landfill into the
airspace over its land. In other words, if the FAA and the City suddenly removed all of the height
restrictions currently affecting TCLC's land, TCLC would still maintain that overflights alone
diminished the value of its property. Furthermore, the City has not challenged either appraiser's
testimony regarding the heightened risk the landfill owner will face operating the landfill with 100
civilian aircraft flying over the landfill every day. Therefore, any challenge the City may have
preserved regarding the damages awarded to TCLC is overruled.


The Court's Charge to the Jury

 In the City's sixth issue, it complains that the trial court erred in submitting jury
questions one and two. However, the City did not properly preserve at the trial court all the
complaints embedded within this issue, nor has the City presented argument to support many of
the complaints raised in the sixth issue. 

 In order to preserve error in the charge at the trial court, a party must either (1)
object to the question, or (2) submit in writing to the trial court a substantially correct question,
depending on whether the complaining party claims error in a question on which it relied or in a
question relied on by its opponent. See Tex. R. Civ. P. 278. The City did not object to question
two, which asked the jury to determine the fair market value of TCLC land on the date overflights
began. There is no request for a substantially correct version of question two in the record before
us. Finally, the City presents no argument on appeal challenging any part of question two. See
Tex. R. App. P. 38.1(h) (appellants' brief must contain argument for contentions made).
Therefore, the challenge to question two is waived.

 The City did object to question one, which is sufficient to preserve error regarding
a defect in a question. See Tex. R. Civ. P. 272, 274. While the City's issue complains about the
submitted question, however, the argument on appeal supporting this issue addresses only one of
the three instructions accompanying question one:


QUESTION NO. 1 (12)



 Beginning on or about June 30, 1997, has the City of Austin taken TCLC's
airspace rights by overflights associated with the operation of the Austin-Bergstrom
International Airport?


 Airspace rights are taken by overflight if:

 

 . . . .

 

 (2) the flights regularly occur at altitudes below the normal safe level of
flight (500 feet in uncongested areas, 1000 feet in congested areas);

 

 . . . .

 

 Answer "Yes" or "No":

 

 ANSWER: Yes 



 The City contends that instruction two is erroneous because it "misstate[s] the law
and rest[s] on the faulty premise that federal navigable airspace cannot exist below an altitude of
500 feet." We do not believe the City has properly preserved this complaint because there is no
record of any "substantially correct definition or instruction" submitted by the City to the trial
court. See Tex. R. Civ. P. 278. (13) In the event this complaint has been preserved, however, we
hold that the trial court did not abuse its discretion by submitting this instruction. See Texas Dep't
of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990) (standard of review for jury charge
is abuse of discretion). We have explained above that even though airspace below 500 feet may
constitute federal navigable airspace, this does not eliminate a landowner's takings claim for
overflights in that airspace. See Griggs, 369 U.S. at 87, 89; Brown, 73 F.3d at 1102 (court noted
that the Browns' complaint was based on flights flying "less than 500 feet above ground level"
over their property). While it may be preferable for a trial court to ask whether the flights occur
at "low" altitudes, rather than at altitudes below the normal safe level of flight, the court did not
act without reference to guiding legal principals in submitting this charge. The City's sixth issue
is overruled.


Standing and Statute of Limitations

 In its second issue, the City argues that an obstruction easement placing height
restrictions on the property was taken in the 1940s, when flights first began flying over the subject
property, or in 1958, when Congress first defined the airspace over the subject property as federal
navigable airspace. The City complains, therefore, that TCLC is not the proper party to bring this
takings claim because only the owner of the property at the time of the original taking, either in
the 1940s or 1958, is entitled to payment. In its fourth issue, the City argues that TCLC's takings
claim is barred by the statute of limitations for the same reasons. These issues are not properly
before this Court. First, they were not raised in the City's answer to TCLC's petition. (14) 
Furthermore, the City did not request a jury submission regarding the statute of limitations
affirmative defense. See Tex. R. Civ. P. 279 (parties must submit questions regarding defenses
in order to preserve error). The City's contention that it properly preserved these issues through
its motion for judgment notwithstanding the verdict is without merit. Accordingly, issues two and
four are overruled. 

 We have overruled all of the issues raised by the City in this appeal. Therefore,
we affirm that part of the judgment finding the City liable to TCLC in the amount of $2,950,000. 
We now turn to the issues raised by TCLC in its role as appellant.


II. TCLC's Appeal

TCLC's Request for Injunctive Relief

 In its motion for judgment on the verdict, TCLC requested the trial court to enjoin
the City from directing or allowing commercial flights over its property until all monetary
amounts awarded to TCLC were paid, or until the City deposited a security payable to TCLC into
the registry of the Court. The trial court denied this request in the final judgment. TCLC now
appeals the trial court's decision not to issue a permanent injunction against overflights pending
final payment of the judgment.

 Appellate review of a trial court judgment granting or denying a permanent
injunction is strictly limited to a determination of whether there has been a clear abuse of
discretion. See Risk Managers Int'l, Inc. v. State, 858 S.W.2d 567, 569-70 (Tex. App.--Austin
1993, writ denied); Priest v. Texas Animal Health Comm'n, 780 S.W.2d 874, 875-76 (Tex.
App.--Dallas 1989, no writ). TCLC argues that the trial court abused its discretion by not issuing
a permanent injunction in this case because it found that the City took TCLC's property yet
refused to enjoin further physical possession of the property until the City compensated TCLC.

 The Texas Constitution states:


No person's property shall be taken, damaged or destroyed for or applied to public
use without adequate compensation being made, unless by the consent of such
person; and when taken, except for the use of the State, such compensation shall
be first made, or secured by a deposit of money . . . .



Tex. Const. art I, § 17 (emphasis added). Thus, the Texas Constitution requires a political
subdivision of the State, such as the City, to compensate the landowner or deposit a security before
it takes property for public use. In this case, the City did neither, and TCLC brought the instant
inverse condemnation proceeding seeking compensation. When a party brings inverse
condemnation proceedings against a political subdivision of the state, the political subdivision is
permitted by statute to counterclaim and either assert a claim to the property or seek to condemn
the property. See Tex. Prop. Code Ann. § 21.017 (West 1984). If the party seeks injunctive
relief against the political subdivision, the trial court may grant the injunction or, instead of
granting the injunction, "a court may require a condemnor to provide security adequate to
compensate the property owner for damages that might result from the condemnation." Id.
§ 21.064.

 In this case, the City did not assert a counterclaim to condemn the property, and
in the final judgment, the trial court did not enjoin the City from further overflights. TCLC
argues that by not asserting a counterclaim, the City abandoned its opportunity to provide a
security deposit in lieu of being subjected to an injunction as provided by Property Code section
21.064. TCLC contends that because the trial court failed to issue a permanent injunction against
overflights, the City has been rewarded for its failure to institute a lawful condemnation
proceeding because it has not had to post a security deposit and it is not enjoined from further
overflights. TCLC urges that because it has prevailed in its takings claim against the City,
denying its request for injunctive relief conditioned upon a security deposit offends the Texas
Constitution by permitting the City to take TCLC's property rights without prior compensation. 

 Texas case law supports TCLC's position. In Brazos River Conservation &
Reclamation District v. Costello, 143 S.W.2d 577 (Tex. 1940), the trial court enjoined the District
from actions that would take the complaining landowner's property. The District filed a cross-action to condemn the subject property under the authority of article 3269, the predecessor statute
to Property Code sections 21.017 and 21.064. (15) The District offered to pay a security into the
registry of the court as the court might deem proper; the trial court determined a sum but
nonetheless did not dissolve the injunction against the District. Costello, 143 S.W.2d at 578. The
court of appeals affirmed the trial court's decision, holding that if article 3269 permitted the
District to condemn by cross-action, the article was unconstitutional "because it would permit the
dissolution of the injunction and the taking of properties" without providing for payment of
damages, and it left to the discretion of the trial court whether any security should be deposited. 
See id. at 579. The court of appeals also held that "in no event should the State take the private
property of individuals, leaving the owners to depend upon the discretion of a trial court as to the
giving of security in advance of the taking." Id.

 The supreme court reversed the court of appeals, holding that article 3269 should
be read in connection with article I, section 17. See id. at 580. Construing it in this manner led
to the conclusion that "the court, in the exercise of its power, must require that every prerequisite
of the Constitution be fully complied with before a person's property can be applied to public use. 
The statute as thus construed does not violate the Constitution of this State." Id. (emphasis
added). The court went on to hold that since the District was "ready, willing, and able" to deposit
a security, "when said District has deposited in cash the sum allowed the landowners by said court
. . . the said writ of injunction issued by the trial court shall be dissolved." Id.

 In Koslosky v. Texas Electric Service Co., 213 S.W.2d 853 (Tex. Civ.
App.--Eastland 1948, writ ref'd), the court cited Costello when it stated: "Where property is
taken, compensation therefor must be paid in advance or payment thereof secured. Unless such
compensation is paid in advance, or unless Article 3269 . . . is complied with, an injunction
should be issued to prevent such taking." Id. at 854-855.

 In the cases discussed above, the injunctions were ordered to be dissolved once the
taking entity posted a security deposit. See Costello, 143 S.W.2d at 580; Koslosky, 213 S.W.2d
at 855. In this case, the entity charged with the taking is neither enjoined from further possession
of the property nor is it required to deposit a security pending final resolution of the claim. We
need not determine whether case law interpreting the Texas Constitution mandates the trial court
to issue an injunction in this situation, however, because we believe that federal law preempts any
state law requirement that a permanent injunction issue to prohibit continued overflights.

 To determine whether state law or judicial action conflicts with federal law, this
Court must decide whether compliance with both state and federal law is impossible or whether
the state law stands as an obstacle to the full objectives of Congress. Capital Cities Cable, Inc.
v. Crisp, 467 U.S. 691, 699 (1984). As we explained in our discussion of the City's appeal, the
United States Code provides:


§ 40103. Sovereignty and use of airspace


(a) Sovereignty and public right of transit.--(1) The United States Government
has exclusive sovereignty of airspace of the United States.



49 U.S.C.A.§ 40103(a)(1) (West 1997). Congress has given the FAA authority to regulate flights
through federal navigable airspace. See id. § 40103(b). Although the United States Supreme
Court has given landowners the right to compensation when flights through superjacent airspace
are so low and frequent as to constitute a taking, see Griggs, 369 U.S. at 89-90; Causby, 328 U.S.
at 266, these cases do not extend to landowners the right to enjoin the overflights. See United
States v. City of New Haven, 367 F. Supp. 1338 (D. Conn. 1973) (holding that state court had
no power to enjoin airport operations).

 TCLC argues that federal regulations support its position that it is entitled to an
injunction against continued overflights. FAA Order 5100.37A ("FAA Order") instructs an
airport owner to "take the necessary action to file for condemnation" and states: "The airport
owner shall not intentionally make it necessary for the property owner to institute legal
proceedings to prove the fact of the taking of the real property." United States Department of
Transportation, Federal Aviation Administration, Acquisition and Relocation Assistance for
Airport Projects, Order 5100.37A ¶ 3-34 (April 4, 1994). The FAA Order also states that "in the
case of condemnation," the airport owner "shall . . . deposit with the court . . . the court award
of compensation in the condemnation proceeding for the property." Id. We have also noted
previously that FAA Advisory Circular 150/5100-17 instructs airport owners that avigation
easements should be acquired for the approach area.

 We agree that these federal guidelines instruct airport sponsors on the process to
follow when acquiring needed property rights; however, the regulations do not manifest an intent
that an airport sponsor be enjoined from directing flights through federal navigable airspace when
the guidelines are not followed. The only intent we discern from federal law applicable to TCLC's
request for an injunction is Congress's statement that the United States has exclusive sovereignty
over the airspace. A Texas state court may not assume authority over the airspace by issuing an
injunction against further overflights in light of this federal law. Thus, under the facts of this
case, we decline to hold that the trial court abused its discretion by denying a permanent injunction
against further flights through the airspace over TCLC's land. TCLC's first issue is overruled.


Attorney's Fees

 The trial court denied TCLC's request for attorney's fees, stating in the judgment: 
"Attorney's fees and expenses are not awarded to Plaintiff due to the absence of statutory
authority." In its second issue, TCLC contends this was error. We must disagree.

 Recovery of attorney's fees is adverse to the common law and penal in nature, and
statutes providing for such recovery must be strictly construed. See New Amsterdam Cas. Co. v.
Texas Indus. Inc., 414 S.W.2d 914, 915 (Tex. 1967); Van Zandt v. Fort Worth Press, 359 S.W.2d
893, 895 (Tex. 1962). Texas law provides no statutory authority for awarding attorney's fees in
inverse condemnation claims arising under Article I, section 17 of the Texas Constitution. See
State v. Biggar, 848 S.W.2d 291, 298 (Tex. App.--Austin 1993), aff'd, 873 S.W.2d 11 (Tex.
1994). 

 TCLC does not dispute the general rule. It argues, however, that relevant federal
law provides the statutory authority allowing it to recover attorney's fees under its state inverse
condemnation claim, citing the Uniform Relocation Assistance and Real Property Act ("Uniform
Act"), 42 U.S.C.A. §§ 4601-4655 (West 1995). The Uniform Act is a federal statute that
provides for the recovery of litigation expenses, including attorney's fees, by plaintiffs who
instigate inverse condemnation proceedings under section 1346(a)(2) or 1491 of Title 28 (16) of the
United States Code. The relevant section states:


§ 4654. Litigation expenses


 . . . .


(c) Claims against the United States


 The court rendering a judgment for the plaintiff in a proceeding brought under
section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of
property by a Federal agency, . . . shall determine and award or allow to such
plaintiff, as a part of such judgment . . . such sum as will . . . reimburse such
plaintiff for his reasonable costs; disbursements; and expenses, including
reasonable attorney, appraisal, and engineering fees, actually incurred because of
such proceeding.



42 U.S.C.A. § 4654.

 Thus, section 4654 provides authority for the award of attorney's fees and expenses
in actions brought in either federal court or the Court of Federal Claims. The Uniform Act
contains no express authority for a similar award for state causes of action filed in state court. 
Further, the federal regulation implementing the Uniform Act, cited by TCLC as supporting its
claim, likewise provides no express grant of authority. The relied upon regulation states: 


24.107 Certain litigation expenses.


The owner of real property shall be reimbursed for any reasonable expense,
including reasonable attorney, appraisal, and engineering fees, which the owner
actually incurred because of a condemnation proceeding, if:


. . . . 


(c) The court having jurisdiction renders a judgment in favor of the owner in an
inverse condemnation proceeding or the Agency effects a settlement of such
proceeding.



49 C.F.R § 24.107 (1998). The regulations define the term "Agency" as "the Federal Agency,
State, State agency, or person that acquires real property," while the term "State agency" is
defined as, among other things, "a political subdivision of a State." Id. § 24.2(a), (a)(1). At
most, section 24.107 clarifies that section 4654 applies to governmental entities facing claims in
federal court or the Court of Federal Claims. It does not provide statutory authority for state
courts to award attorney's fees for successful inverse condemnation claims arising under state law. 

 Only one other statutory provision might be construed as authorizing the award of
attorney's fees, that being section 4655, which provides:


§ 4655. Requirements for uniform land acquisition policies


(a) Payments of expenses incidental to transfer of real property to State (17)


Notwithstanding any other law, the head of a Federal agency shall not approve any
program or project or any grant to . . . an acquiring agency (18) under which Federal
financial assistance will be available to pay all or part of the cost of any program
or project which will result in the acquisition of real property . . . unless he
receives satisfactory assurances from such acquiring agency that--


(1) in acquiring real property it will be guided, to the greatest extent practicable
under State law, by the land acquisition policies in section 4651 . . . and . . .
section 4652 of this title. (19)


(2) property owners will be paid or reimbursed for necessary expenses as
specified in sections 4653 and 4654 of this title.


42 U.S.C.A. § 4655 (emphasis added). By its terms, the Uniform Act prohibits a federal agency
from approving any federally funded project in which a political subdivision of a state acquires
real property without assuring that the acquiring political subdivision will (1) follow the land
acquisition policies of the Uniform Act, to the extent possible under State law; and (2) reimburse
property owners for litigation expenses should the property owner be forced to institute inverse
condemnation proceedings. 

 Thus, section 4655 governs the relationship between the City and the federal agency
from which it seeks federal funds. It does not create a landowner's cause of action for attorney's
fees in the event the City fails to comply with the land acquisition policies outlined in the statute. 
See City of Buffalo v. Clemente, 360 N.Y.S.2d 362, 366 (1974) (holding that section 4655
prescribes conduct between federal agencies and state agencies in condemnation actions involving
federal funds).

 Because we find no statutory authority for an award of attorney's fees or litigation
expenses in TCLC's state inverse condemnation claim, the trial court did not err by refusing to
award them. TCLC's second issue is overruled. 


CONCLUSION

 We have overruled the City's and TCLC's issues. The trial court judgment is
affirmed.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Kidd and Patterson

Affirmed

Filed: August 26, 1999

Publish

1. The federal government decided to close Bergstrom in the early 1990s. Pursuant to a 1942
agreement between the City and the federal government, the Bergstrom property reverted to City
ownership.
2. The right to fly over the subject property is known as an "avigation" easement. The term
"avigation" "applies to the navigation of airspace." 2A CJS Aeronautics & Aerospace § 2 (1972). 
"Thus, an avigation easement generally is an easement of right to the navigation of airspace over
designated land and to the use of land as an incident to air avigation. . . . It provides not just for
flights in the air as a public highway, but for flights that may be so low and so frequent as to
amount to a taking of the property." Id.
3. Mays compared his position to "a corporate officer, if [TCLC] were a corporation."
4. The trial court granted TCLC's request for a temporary injunction. The City appealed, and
this Court dissolved the temporary injunction in an unpublished opinion. See City of Austin v.
Travis County Landfill Co., No. 03-97-00515-CV (Tex. App.--Austin February 26, 1998, no pet.)
(not designated for publication). 
5. A Type I landfill permits "putrescible" waste, such as household garbage. These types of
landfills attract rodents and birds. Because it was not in the direct flight path of the two airport
runways, the City was able to operate its landfill as a Type I landfill when the military operated
the airport. When Bergstrom became a municipal airport, the FAA required the City's landfill
to operate as a Type IV landfill. 
6. Bergstrom objected to the Company's original intent to operate a Type I landfill because a
Type I landfill, located directly under the flight path of one of Bergstrom's runways, created the
risk of birds interfering with takeoffs and landings. 
7. The trial court had also submitted to the jury a question regarding attorney's fees for TCLC. 
In its motion for judgment notwithstanding the verdict, the City argued that no statutory authority
exists for the award of attorney's fees to TCLC. The trial court granted this part of the motion,
which we will discuss when we review TCLC's appeal. 
8. A pilot landing under visual conditions may use his or her discretion in deciding whether
to follow the glide slope, although the pilot has to fly "close" to it. 
9. The FAA Circular explains that its purpose is to provide "guidance to sponsors of airport
projects . . . to meet the requirements of the Uniform Relocations Assistance and Real Property
Acquisition Act of 1970 (Pl 91-646, as amended) and the Regulations of the Office of the
Secretary of Transportation, 49 CFR Part 24." The FAA Circular also states that "[s]ponsor land
acquisition . . . shall comply [with 49 CFR Part 24] on any Federally assisted airport project
funded" under the Airport Improvement Program. 
10. The City is authorized to zone the airport, which is outside of the City's boundaries,
pursuant to the Airport Zoning Act. See Tex. Loc. Gov't Code Ann. §§ 241.001-.903 (West
1999).
11. Some of the federal guidelines referred to by both Young and Rizer are found in the
previously mentioned FAA Advisory Circular, which states, "The appraisal of the property to be
acquired shall disregard any decrease or increase in the fair market value of the real property
caused by the project for which the property is to be acquired . . . ." United States Department
of Transportation, Federal Aviation Administration, Land Acquisition and Relocation Assistance
for Airport Improvement Program Assisted Projects, Advisory Circular 150/5100-17 ¶ 2-1(d)
(March 29, 1996). 
12. The dissent concludes that instruction three to Jury Question Number One misstates the law
and probably caused the rendition of an improper judgment. Although the City objected to this
instruction at the trial court, it does not present any argument on appeal relating to instruction
three and none of its arguments on appeal address this instruction. See Tex. R. App. P. 38.1(h)
(appellants' brief must contain arguments for contentions made). Therefore, we conclude that any
complaint regarding instruction three is waived. 
13. We note that the City's inclusion in its reply brief of an unfiled copy of its requested
definitions or instructions cannot be considered because a filed copy of the same does not appear
in the clerk's record. 
14. The City did plead the affirmative defense of statute of limitations, but it asserted different
dates in the 1990s as the start of the limitations period.
15. See Tex. Rev. Civ. Stat. Ann. art. 3269 (West 1968), repealed by Act of May 24, 1983,
68th Leg., R.S., ch. 576, § 6, 1983 Tex. Gen. Laws 3475, 3729 (codified at Tex. Prop. Code
Ann. §§ 21.017, .064 (West 1984)).
16. 28 U.S.C.A section 1346(a)(2) provides that federal district courts have original
jurisdiction, concurrent with the United States Court of Federal Claims, over certain civil actions
against the United States, while section 1491 provides that the Court of Federal Claims has
jurisdiction to render judgment upon any claim against the United States founded upon, among
other things, the federal constitution. See 28 U.S.C.A. §§ 1346(a)(2), 1491 (West 1994 & Supp.
1998).
17. "State" is defined as, among other things, "any political subdivision" of any State of the
United States. 42 U.S.C.A. § 4601 (West 1995). 
18. "Acquiring agency" is defined as a State agency that has the authority to acquire property
by eminent domain under State law. 42 U.S.C.A. § 4655(b) (West 1995). A "State agency" is
defined by the statute as, among other things, "a political subdivision of a State." Id. § 4601. 
19. Section 4651 requires Federal agencies to exclude from consideration any increase or
decrease in the fair market value resulting from the public project for which the property is to be
taken. See 42 U.S.C.A. § 4651 (West 1995).



the airport. When Bergstrom became a municipal airport, the FAA required the City's landfill
to operate as a Type IV landfill. 
6. Bergstrom objected to the Company's original intent to operate a Type I landfill because a
Type I landfill, located directly under the flight path of one of Bergstrom's runways, created the
risk of birds interfering with takeoffs and landings. 
7. The trial court had also submitted to the jury a question regarding attorney's fees for TCLC. 
In its motion for judgment notwithstanding the verdict, the City argued that no statutory authority
exists for the award of attorney's fees to TCLC. The trial court granted this part of the motion,
which we will discuss when we review TCLC's appeal. 
8. A pilot landing under visual conditions may use his or her discretion in deciding whether
to follow the glide slope, although the pilot has to fly "close" to it. 
9. The FAA Circular explains that its purpose is to provide "guidance to sponsors of airport
projects . . . to meet the requirements of the Uniform Relocations Assistance and Real Property
Acquisition Act of 1970 (Pl 91-646, as amended) and the Regulations of the Office of the
Secretary of Transportation, 49 CFR Part 24." The FAA Circular also states that "[s]ponsor land
acquisition . . . shall comply [with 49 CFR Part 24] on any Federally assisted airport project
funded" under the Airport Improvement Program. 
10. The City is authorized to zone the airport, which is outside of the City's boundaries,
pursuant to the Airport Zoning Act. See Tex. Loc. Gov't Code Ann. §§ 241.001-.903 (West
1999).
11. Some of the federal guidelines referred to by both Young and Rizer are found in the
previously mentioned FAA Advisory Circular, which states, "The appraisal of the property to be
acquired shall disregard any decrease or increase in the fair marke